FILED
JUN - 6 2012
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2    Including Professional Corporations
   JAMES M. CHADWICK, Cal. Bar No. 157114
3  TENAYA RODEWALD, Cal. Bar No. 248563
   379 Lytton Avenue
4  Palo Alto, California 94301-1479
   Telephone:  650.815.2600
5  Facsimile:  650.815.2601
   Email:  jchadwick@sheppardmullin.com
6          trodewald@sheppardmullin.com

7  Attorneys for Non-Parties, ELECTRONIC
   FRONTIER FOUNDATION and PETER
8  ECKERSLEY

RS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

BETSY FEIST,

  Plaintiff,

  v.

RCN CORP. and PAXFIRE, INC.,

  Defendants.

Case No. CV 12 80 135 MISC

DECLARATION OF ARVIND NARAYANAN IN SUPPORT OF MOTION TO QUASH SUBPOENAS ISSUED BY DEFENDANT PAXFIRE, INC. AND REQUEST FOR PROTECTIVE ORDER

Date:
Time:
Crtrm.:

The Hon.

NARAYANAN DECLARATION ISO
MOTION TO QUASH SUBPOENAS

I, Arvind Narayanan, declare as follows:

1. I have personal knowledge of the following matters and if called as a witness, I could and would competently testify to the facts stated herein.

2. I'm a post-doctoral computer science researcher at Stanford University and a junior affiliate scholar with the Center for Internet and Society at Stanford Law School. I study information privacy and security, and do work in public policy relating to these topics. My doctoral research investigated the ways in which companies attempt to remove personal information about consumers from data so that, for example, the data can be published or transferred to other companies without violating consumer privacy. My research exposed the problems with companies' current practices and showed that the level of anonymity that consumers expect—and companies claim to provide—in published or outsourced databases is fundamentally unrealizable. For example, a colleague and I demonstrated that the "anonymized" data Netflix released as part of a contest to improve their movie recommendation system could be used to identify specific customers. My more recent work has focused on what I call "privacy-conscious system design" in the areas of online behavioral advertising (including "Do Not Track") and location privacy. I have also undertaken analyses of pending and proposed legislation and regulation, including providing comments and feedback to the Department of Homeland Security and the Federal Trade Commission.

3. I have worked with the Electronic Frontier Foundation ("EFF") on numerous technology and policy issues, and regularly collaborate with EFF on reviews of each others' blog posts. Important areas in which I collaborated with EFF include the following:

4. I worked with EFF on a technology and policy analysis of the National Strategy for Trusted Identities in Cyberspace (NSTIC), a proposal by the Obama administration to create secure online identities for Internet users. I then joined EFF in giving feedback to the Department of Homeland Security on NSTIC. I also co-authored a public comment on NSTIC that benefited significantly from my discussions with the EFF. *See* http://www.stanford.edu/~jmayer/papers/nstic10.pdf.

5. I received extremely helpful input from EFF in my analysis of Do Not Track ("DNT"), a proposed internet standard that lets users opt-out of having websites track their online behavior. I have coauthored numerous blog posts and articles with technical and policy analysis of DNT, for example http://webpolicy.org/2012/04/23/tracking-not-required-frequency-capping/. With my Stanford colleague Jonathan Mayer, I have also created and maintained http://donottrack.us, a central clearinghouse for aggregating information about DNT. DNT is now supported by Internet Explorer, Firefox and Safari. EFF provided valuable technology and policy input for this work including technical feedback on the standard and advice about how to get public support for the standard through public advocacy. EFF did some early blog posts and spurred public discussion of the standard and helped me to develop the public-facing parts of the effort.

6. I also collaborated with EFF in submitting public input regarding Do Not Track to the Federal Trade Commission. *See* http://donottrack.us/docs/FTC_Privacy_Comment_Stanford.pdf. I also worked with EFF to help develop and amend the Do Not Track bill that Congresswoman Jackie Speier (D-Calif.) introduced last year. The bill would require an online opt-out mechanism (similar to the current DNT standard) to allow consumers to effectively and easily prohibit the collection or use of data about them. I believe I was able to make an important contribution to the proposed legislation because of my experience in helping develop the DNT standard and EFF helped facilitate my input.

7. I helped Peter Eckersley and EFF with technology analysis of Panopticlick and Panopticklick data. Panopticklick is a tool Peter Eckersley and EFF developed that tests how unique a user's browser is based on the information it will share with sites the user visits. See https://panopticlick.eff.org/ Analysis of Panopticlick data showed individual browsers can be identified to a high degree of accuracy without cookies or other commonly understood "stateful" tracking technology. Because it means that users are much more easily identified than most people previously understood, this type of information is essential for users to make informed decisions about how they interact with Internet websites. It is also essential to informed public debate on new technologies, standards, policies and legislation regarding user privacy. I believe

1  EFF depends on the expertise and skills of researchers like me when developing tools like
2  Panopticlick, and in analyzing the resulting data and the policy implications of the research.
3     8.    All of the work discussed above benefitted in essential ways from my ability to
4  work with EFF, and it depended critically from being able to communicate with EFF in
5  confidence. In each case, EFF and I needed to pool our resources and gain the benefit of the
6  other's expertise in technology, advocacy and policy.
7     9.    In my collaborations with EFF, I have had many frank discussions with them about
8  technological and legislative implementation of Do Not Track and similar consumer controls.
9  Such frank discussions, including testing vulnerabilities in technology and policy proposals, and
10 airing and considering the most incisive criticism possible, is a necessary step to producing good
11 technology, policy proposals and recommendations.
12    10.   I would hesitate to have frank discussions with EFF about existing technology and
13 technology that is in development and the policy and legal implications of that technology if I had
14 to worry that my comments might be made public in an untimely manner. Such untimely
15 revelations could allow others to exploit vulnerabilities or learn new ways to invade others'
16 privacy before I or others had determined the best means, whether through publicity,
17 recommendations or technology responses, to prevent possible harm. Of course, I and EFF would
18 hesitate to critically discuss policy recommendations if our private comments might be taken out
19 of context to discredit us, distort our positions or simply distract from our intended message.
20    11.   As a more specific example, I worked with EFF to develop and suggest
21 amendments to Rep. Speier's Do Not Track legislation. Collaboration was necessary so that EFF
22 could benefit from my expertise in helping develop the proposed DNT standard, and I could
23 benefit from EFF's extensive policy and legislative experience. As with any similar project, it
24 would be impossible to honestly and critically discuss suggested changes to the legislation if
25 opponents might be able to obtain our comments and use them to undermine the legislation or our
26 participation in the process.
27    12.   In addition, EFF and I are occasionally in a position to discuss privileged
28 information about companies – upcoming announcements, security vulnerabilities found by our

-3-    NARAYANAN DECLARATION ISO
       MOTION TO QUASH SUBPOENAS

colleagues and not yet made public, etc. It is important that we discuss such information so that both EFF and I can remain informed about the latest developments and, when necessary, help each other formulate public comments or technology, policy or legislative responses. If we were not able to keep important information confidential it would hurt our reputations as researchers, or, as I said, allow others to use the information in harmful ways. As a result, we would not learn of the privileged information in time for us to make critical contributions and we would become more isolated in our fields.

13. On a more personal level, I associate with EFF because we share concerns about, among other things, ensuring users understand what happens when they interact with technology, and empowering users to make effective choices about their personal privacy. We often discuss specific practices of companies and whether such practices might be unethical. These companies might be my future employers or fund my research. For example I recently interviewed for a position at Microsoft Research and many of my colleagues have benefited from Google research grants. I could not associate with EFF, and have frank discussions with them about my personal moral views on mutual topics of concern, if I my thoughts or statements might not remain private.

14. If I could not count on my communications with EFF remaining confidential I would have to seriously reconsider whether I could continue most if not all of my work with EFF. I do not believe I would be able to associate with EFF on many critical projects in the future, and this would be detrimental to both me and EFF.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 04, 2012.

_____
ARVIND NARAYANAN