SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
 A Limited Liability Partnership
 Including Professional Corporations
JAMES M. CHADWICK, Cal. Bar No. 157114
TENAYA RODEWALD, Cal. Bar No. 248563
379 Lytton Avenue
Palo Alto, California 94301-1479
Telephone:  650.815.2600
Facsimile:  650.815.2601
Email: jchadwick@sheppardmullin.com
    trodewald@sheppardmullin.com

Attorneys for Non-Parties, ELECTRONIC FRONTIER FOUNDATION and PETER ECKERSLEY

FILED
JUN - 6 2012
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

BETSY FEIST,

    Plaintiff,

    v.

RCN CORP. and PAXFIRE, INC.,

    Defendants.

Case No. CV 12 80 135 MISC RS

DECLARATION OF PETER ECKERSLEY IN SUPPORT OF MOTION TO QUASH SUBPOENAS ISSUED BY DEFENDANT PAXFIRE, INC. AND REQUEST FOR PROTECTIVE ORDER

Date:
Time:
Crtrm.:

The Hon.

I, Peter Eckersley, declare as follows:

1. I am the Technology Projects Director for Non-Party Electronic Frontier Foundation ("EFF"). I am a computer scientist who works on a wide range of Internet policy issues, including copyright, freedom of speech, privacy, innovation and network neutrality. I have personal knowledge of the following matters and if called as a witness, I could and would competently testify to the facts stated herein.

**EFF and My Work As Technology Projects Director**

2. Conversations with researchers and technologists, both inside and outside of corporations, about technilogical matters of possible public policy and legal concern are a common occurrence in my role at EFF. Often these conversations begin speculatively; they cover a wide range of phenomena related to computers and the Internet; evidence and causes for these phenomena; and policy concerns. Potential responses or solutions are also discussed and explored. Sometimes these conversations come to nothing, but on other occasions (a couple of which I note below) they lead to news stories, blog posts, white papers, software projects, legislative action, activist campaigns, EFF legal cases, cases brought by others, or some combination of the above. It can be difficult to determine at the outset which of these paths will be the right one, and often the actual policy goals and outcomes are not formulated until after the technical landscape is clear.

3. It is common for these conversations to be implicitly or explicitly confidential. Even where no trade secret or other proprietary material is at issue, confidentiality in these conversations is an essential protection for conducting technical research; for forming and developing tentative opinions without later being attacked for them; and for protecting sources who feel they have important public policy issues to raise, but do not have the freedom to discuss them publicly. For instance, I personally have had conversations with former employees of casinos who wish to raise alarms about privacy-intrusive technologies used by those casinos but who fear that they will lose their employment and no longer be hired in that industry, or be subjected to other consequences, if they are publicly identified; with employees of telecommunications companies about various systems they had built internally that had not been

1  publicly disclosed; with software engineers about the data their employers collect from their users'
2  systems; with technology companies about important design decisions in forthcoming products
3  that have not yet been announced, and the civil liberties implications of those designs; with
4  members of federal and state regulatory agencies about potential investigations or methods of
5  investigation; with representatives of non-profits and human rights organizations about specific
6  computer security threats those organizations face and how to defend against them; and with staff
7  at some of the world's largest financial firms about those companies' security practices,
8  weaknesses in those practices, and the implications for the design of Internet protocols more
9  generally.

10      4.    The loss of the ability to have such conversations in confidence, free from
11  subsequent subpoenas or other discovery processes, would mean that many if not most of them
12  would not occur or would occur in a very different form, limiting the information that I can
13  receive and limiting EFF's ability to bring to the public, to legislators, and to the courts important
14  issues affecting user privacy and other rights. This would greatly impede many aspects of EFF's
15  work.

16      5.    Similarly, inside EFF we have robust conversations and deliberations both among
17  my fellow technologists (EFF has three staff technologists) and between the EFF technologists and
18  EFF's policy, activism and legal teams. In those conversations we freely discuss and debate
19  technological issues, the various possible policy and legal strategies in response to technical
20  issues, the strengths and weaknesses of potential arguments in support of or in opposition to
21  positions EFF may take, further technical and legal development needed, and approaches to the
22  implementation of strategies for addressing these issues. These deliberations are often wide
23  ranging, as we decide whether a matter is best addressed through litigation, legislation, agency
24  action (EFF sometimes files complaints with the Federal Trade Commission, for instance), public
25  awareness, or otherwise. These discussions, which form the heart of our advocacy strategy and
26  implementation, would be greatly chilled if they could be subpoenaed in subsequent litigation.
27
28

**This Case**

6. For the last several years EFF has been a leading organization concerned with issues of "network neutrality," that is, in the words of a leading law professor Tim Wu, the principle that "a maximally useful public information network aspires to treat all content, sites, and platforms equally." In essence, net neutrality involves ensuring that online service providers and others do not interfere with their customers' access to any part of the Internet, or with the ecosystem of innovation and competition that has made the Internet so useful today. This issue has been the subject of legal and regulatory action by the Federal Communications Commission, multiple court cases, and much public debate and discussion. For example, in 2007, I, my colleague Seth Schoen, and a researcher named Robb Topolski had performed "network neutrality" oriented network testing experiments that obtained the first controlled evidence that Comcast was interfering with its customers internet traffic in violation of that principle. Specifically, Comcast was using forged TCP reset packets to interfere with BitTorrent and other kinds of traffic (some intentional, some apparently accidental) sent and received its customers on its cable networks. This research was a significant factor leading the Federal Communications Commission to institute legal action against Comcast and was also a factor in spurring the FCC to institute a formal rulemaking. I met Dr. Weaver at conferences and workshops discussing network measurement and testing tools, and we conversed about network congestion and other traffic phenomena, as well as methods for conducting research into the neutrality or otherwise of deployed networks.

7. I first became aware the issues presented by Plaintiff's claims in the lawsuit against Paxfire, specifically the DNS-based redirection of search traffic on U.S. residential ISP networks, when I was contacted by Nicholas Weaver, Vern Paxson, and Christian Kriebich, researchers at the International Computer Science Institute (ICSI) affiliated with University of California at Berkeley, in April 2011.

8. In April, 2011, Dr. Weaver and his colleagues told me that the Netalyzr network testing project had discovered that on a number of U.S. ISPs' networks, customers were receiving false Domain Name System (DNS) responses for the domains: www.bing.com, search.yahoo.com,

1 and sometimes www.google.com, the domains for the largest English language search engines
2 The DNS is responsible for turning the human-readable domain names that we use every day (like
3 "www.google.com" or "www.bing.com") into the Internet Protocol (IP) address (like
4 "74.125.225.105" or "50.63.71.1") that computers actually use to route Internet traffic to the
5 correct destination. Netalyzr had discovered that sometimes a customer's computer would request
6 the IP address for "google.com," for example, and the customer would receive back an IP address
7 that wasn't actually associated with "google.com." This would be like calling directory assistance
8 for Google, Inc.'s phone number and being told the wrong number. You would dial the number,
9 thinking you were calling Google, even though you were calling someone else. Similarly, when a
10 user's computer receives a DNS response with an IP address that isn't a correct address for that
11 domain name, the user's computer will still try and communicate with that domain name, but it
12 will make connections and send data to the wrong machines on the Internet.

13     9. If the phenomenon of false DNS responses had occurred by accident, users would
14 experience error messages or incongruous results (such as the wrong web page loading for
15 www.google.com). This would be like calling the number you had been given for Google, Inc.,
16 and being told the number wasn't in service or that you had reached someone's home answering
17 machine. Something would be obviously wrong. Alternatively, you might dial the incorrect
18 number you were given and someone might answer "hello, this is Google." Similarly, when a
19 user's computer tried to communicate using an incorrect IP address, the computers it contacted
20 might act like the real search engine, sending back pages of results that were identical or similar to
21 those the user expected. For a large and complicated website like a search engine, this would most
22 feasibly be performed by relaying the user's search queries on to the real search engine, and
23 transmitting the results pages back to the user. The results might be either completely unchanged
24 or changed in ways that the relayer requests (here it appeared that there were changed responses
25 when the user typed in some terms that also match to particular brand names).

26     10. Computer scientists commonly call this arrangement, where a computer has
27 injected itself as an unauthorized and unexpected party to a communication, a "man-in-the-

28

1 middle." There was extensive evidence that this was happening on the networks flagged by the
2 Netalyzr experiment.

3     11. The ICSI researchers had published one preliminary paper about this phenomenon.
4 Another research team, at Microsoft Research and New York Polytechnic University, had also
5 discovered it and had published a paper conjecturing about its causes.

6     12. The widespread occurrence of this phenomenon on residential ISPs' networks
7 raised a number of serious policy issues for me and EFF. These included privacy concerns,
8 because the "man in the middle" devices would receive all of the affected users' search terms and
9 corresponding search results, apparently without the knowledge of the users. Obviously this can
10 include extremely sensitive information, as users increasingly use search engines to research and
11 find information about their health, finances, sexual relations, religion, politics and many other
12 intimate topics. Even a history of the brand names searched for by a particular individual or
13 household might be sensitive under some circumstances.

14     13. The policy issues also included concerns about network neutrality and the integrity
15 and trustworthiness of the network itself. The development and improvement of network
16 protocols, applications and systems on top of the Internet is only possible if programmers can
17 count on the Internet transmitting data in predictable ways. "Man in the middle" devices of the
18 sort that Netalyzr had discovered in this case pose a serious threat to that innovation process,
19 because they are necessarily engineered with a set of assumptions about the semantics of data
20 being sent over the network. If every ISP on the planet installed different sets of traffic rerouting,
21 inspection and modification equipment, innovation in Internet protocols would be greatly
22 impeded, because newly invented protocols, or new variants of existing protocols, would prove to
23 be incompatible with different subsets of that equipment.

24     14. The privacy, network neutrality, and complication of innovation issues were our
25 main policy and legal concerns, although we also feared that the introduction of "man in the
26 middle" systems would make search engines less reliable to users, and that consumers would
27 incorrectly blame Google, Microsoft, or Yahoo! if one of these mysterious "man in the middle"
28 systems was broken. There was evidence that such breakage had occurred from time to time.

15. Given the serious public policy, privacy and consumer protection issues, implicated by the Netalyzr observations, and consistent with EFF's network neutrality concerns and overall concern with consumer protection, privacy, and the health of the Internet, we were deeply concerned about the findings of the research. We wanted to assist in developing it, bringing the results to the public, and possibly with the pursuit of legal action.

16. We decided, in conjunction with the ICSI researchers, to expose the redirection in an article (a "blog post") published on EFF's website. As explained in the blog post, it had been determined that Paxfire was redirecting the search engine traffic. Attached hereto as Exhibits A and B, respectively, are copies of the blog post and a post explaining certain revisions we made to the blog post after being contacted by Paxfire's counsel.

17. As part of preparing the blog post, I talked to both the ICSI researchers and other sources, all with the intention and understanding that the discussions and/or the names of the sources themselves remain confidential. I also conducted my own research. My investigations were done from California, where I live and work. The ICSI researches and all of the other sources I talked to were also located in California. Communications I had with employees of Google, Yahoo!, Microsoft or others regarding Paxfire, if any, were undertaken as part of these investigations, and I implicitly or explicitly promised my sources confidentiality.

18. We developed the blog post through a drafting process that included a number of drafts exchanged between EFF and the ICSI researchers.

19. As the blog post was being developed, EFF decided not to bring litigation itself. Yet we were still concerned about the behavior of Paxfire and the ISPs. As a result, and as part of EFF's consumer and civil rights advocacy, I contacted Plaintiff's counsel to tell them about the results of the research and offered, if counsel decided to bring suit based on the information, to provide advice and to consult regarding issues in a lawsuit. EFF and I had assisted Plaintiff's counsel with previous litigation arising from other violations of network neutrality and other privacy issues as a paid consultant. As a result of that experience, I believed that they would understand the complex technical issues and also believed that they would seek a resolution that protected internet users.

20. At some point during these conversations, it was decided that I would not act as a paid expert consultant in this particular matter. As a result, neither EFF nor I were retained as paid consultants by Plaintiff's counsel. However, Plaintiff's counsel consulted me and EFF in our capacity as experts in the technology at issue, industry practices, and related law and policy.

**Importance of Confidentiality**

21. As the above indicates, EFF developed and acquired information about the issues raised by the conduct of Paxfire and the ISPs involve in the underlying lawsuit; discussed the matter with the ICSI researchers as part of our further investigations and in developing and drafting the blog post; edited the blog post; engaged in internal discussions about what to do with the information, how to develop the information further, and whether to undertake litigation directly or refer the matter out; and discussed the underlying issues and potential approaches to litigation with Plaintiff's counsel. All of those communications were understood to be confidential, and were intended to remain confidential.

22. The disclosure of EFF's external discussions concerning Paxfire's redirection of user search results and other activities through the document and deposition subpoenas at issue will result in a chilling effect on me and others outside EFF. To be fair to those who approach me in the future with information that might become the subject of litigation and to ensure that neither I nor EFF would be subject to legal claims by sources, I would be compelled to tell them that I might be forced to reveal our communications and that this may include revealing it to the very company or other entity that they are concerned about or even employed by. I would also need to tell them that the information may end up on the public record. This will result in fewer people bringing their concerns to EFF or sharing information with us.

23. Additionally, when I am researching topics for publication, and reaching out to or interviewing sources, I will no longer be able to offer my sources meaningful assurances of confidentiality. This will severely impair my ability gather news and information to publish in articles and blog posts. I regularly rely on my contacts in the technology industry, in government, and in other sectors to provide information and insight for work that I intend to publish. Many

W02-WEST:1TER1\405533740.3 -7-
SMRH:405533740.2  ECKERSLEY DECLARATION ISO MOTION TO QUASH SUBPOENAS

1 people who act as sources would be unwilling to do so if their employers or others could discover that they had shared information with me.

24. Similarly, the revelation of EFF's internal discussions will result in a sharp chilling effect inside the organization as we deliberate about the best ways to use the information that we have developed or received to help protect users online. It will be difficult if not impossible to engage in frank discussions of sensitive technological issues and potential strategies if records of those discussions can be obtained through discovery in litigation.

25. The effect on both our internal and external discussions will be to greatly undermine and harm EFF's ability to participate effectively in public debate, in litigation, and in the legislative and administrative processes with critical technical information and a legal or policy strategy that is timely and appropriate. Ultimately, the effect will be that EFF will be far less able to stand up for users of technology and serve its role as a public watchdog.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 5, 2012.

_____
PETER ECKERSLEY



**ELECTRONIC FRONTIER FOUNDATION**
DEFENDING YOUR RIGHTS IN THE DIGITAL WORLD

HOME | ABOUT | OUR WORK | DEEPLINKS BLOG | PRESS ROOM | TAKE ACTION | SHOP

AUGUST 4, 2011 | BY PETER ECKERSLEY

## Widespread Hijacking of Search Traffic in the United States

*By ICSI researchers Christian Kreibich, Nicholas Weaver and Vern Paxson, with Peter Eckersley.*

**UPDATE, 8/25/11: There are a couple of revisions to this post which are marked inline below, and explained further here.**

Earlier this year, two research papers reported the observation of strange phenomena in the Domain Name System (DNS) at several US ISPs. On these ISPs' networks, some or all traffic to major search engines, including Bing, Yahoo! and (sometimes) Google, is being directed to mysterious third party proxies.

A report in New Scientist today documents that the traffic is being rerouted through a company called Paxfire. This blog post, coauthored with one of the teams that discovered the phenomenon, will explain the situation in more detail.

### Who is rerouting this search traffic?

The published research papers did not identify the controller of the proxy servers that were receiving the traffic, but parallel investigations by the ICSI Networking Group and EFF have since revealed a company called Paxfire as the main actor behind this interception. Paxfire's privacy policy says that it may retain copies of users' "queries", a vague term that could be construed to mean either the domain names that they look up or the searches they conduct, or both. The redirections mostly occur transparently to the user and few if any of the affected ISP customers are likely to have ever heard of Paxfire, let alone consented to this ~~collection~~ **rerouting and occasional logging and alteration** of their communications with search engines.

The proxies in question are operated either directly by Paxfire, or by the ISPs using web proxies provided by Paxfire. Major users of the Paxfire system include Cavalier, Cogent, Frontier, Fuse, DirecPC, RCN, and Wide Open West. Charter also used Paxfire in the past, but appears to have discontinued this practice.

### Why do they do this?

In short, the purpose appears to be monetization of users' searches. ICSI Networking's investigation has revealed that Paxfire's HTTP proxies selectively siphon search requests out of the proxied traffic flows and redirect them through one or more affiliate marketing programs, presumably resulting in commission payments to Paxfire and the ISPs involved. The affiliate programs involved include Commission Junction, the Google Affiliate Network, LinkShare, and Ask.com. When looking up brand names such as "apple", "dell", "groupon", and "wsj", the affiliate programs direct the queries to the corresponding brands' websites or to search assistance pages instead of providing the intended search engine results page.

### What can I do about it?

If you want to know if the network you're currently on is subject to this type of traffic redirection, you can run a Netalyzr test. And the best protection against the privacy and security risks created by this type of hijacking is to visit sites using HTTPS rather than HTTP, which can easily be achieved using EFF's HTTPS Everywhere Firefox extension.

More technical details below...

### A detailed explanation

For most users of the World Wide Web, visiting a website equals clicking on a link to the site or entering the site's name into their browser, and receiving the corresponding page from the site. Users generally assume that the site's name is identical to the site itself, and essentially trust the site's authenticity if it looks as usual and the browser does not pop up phishing warnings or other signs of trouble. Paxfire's misdirection of search traffic undermines this trust.

The ICSI Networking group develops and operates the ICSI Netalyzr, a tool that tests the characteristics of users' Internet connections. Netalyzr's measurements show that approximately a dozen US Internet Service Providers (ISPs), including DirecPC, Frontier,



Donate to EFF

Join EFF

**Stay in Touch**

Email Address

Zip Code (optional)

SIGN UP NOW

**Follow EFF**

Is Israel's search of visitors' email accounts legal? Analysis from lawyer @jonklinger
https://eff.org/r.4acA
JUN 6 @ 1:08PM

LinkedIn iOS app caught leaking user meeting details back to their servers, says @nytimes https://eff.org/r.2ac7
JUN 5 @ 6:00PM

Twitter  Facebook  Identi.ca

**Projects**

HTTPS Everywhere
Bloggers' Rights
Coders' Rights
FOIA Project
Follow EFF
Free Speech Weak Links
Global Chokepoints
Patent Busting
Surveillance Self-Defense
Takedown Hall of Shame
Teaching Copyright
Ways To Help

Hughes, and Wide Open West, deliberately and with no visible indication route thousands of users' entire web search traffic via Paxfire's web proxies.

To explain these redirections further, we first need to delve into the workings of the Internet a bit. Since the Internet does not route traffic to names but to network addresses, contacting a website involves translating the site's name (say "www.google.com") to the IP address (say 74.125.224.49) of a computer that runs Google's web server. It is to this address that the browser actually sends its request. The Domain Name System (DNS) is in charge of facilitating this mapping of names to addresses. It is the Internet's equivalent of telephone books.

Usually, ISPs provide DNS servers (directory assistance, essentially) for their users. When a user's computer asks to map a name to an IP address, the user's system contacts the ISP's DNS server, which looks up the correct IP address for the name and returns it to the user. As currently implemented, this process does not provide any guaranteed correctness. In essence, users must trust their ISP's DNS servers to correctly return IP addresses that indeed belong to the site the user intends to visit. In some instances, however, this trust may not be warranted.

For a while now, a number of ISPs have worked in cooperation with Paxfire and similar businesses like Barefruit and Golog to profit from mistakes that users make when typing names into their browsers. Paxfire provides a product for ISPs that rewrites DNS errors (effectively conveying "the name you asked for doesn't exist") to responses sending users to search pages that host advertisements, for which Paxfire then shares the corresponding ad-related revenue with the ISPs. This practice has already been controversial.

Rerouting of requests to and responses from search engines

Paxfire's product also includes an optional, unadvertised, and more alarming feature that drastically expands Paxfire's window into users' traffic. Instead of activating only upon error, this product redirects the customers' *entire* web search traffic destined for Yahoo!, Bing, and sometimes Google, to a small number of separate web traffic proxies.

These proxies collect receive, examine and process all search terms and results, but only log a small subset of search queries that were entered into a browser search box and are related to major trademark holders, the users' web searches and the corresponding search results, mostly forwarding them the rest to and from the intended search engines. This allows Paxfire and/or the ISPs to directly monitor all searches made by the ISPs' customers Paxfire's code to examine the queries and responses, selecting out those that are of relevance to its business. and build up corresponding profiles, a process on which Paxfire holds a patent. It also puts Paxfire in a position to modify the underlying traffic if it decides to.

Under specific conditions, the Paxfire proxies do not merely relay traffic to and from the search engines. When the user initiates searches for specific keywords from the browser's URL bar or search bar, the proxy no longer relays the query to the intended search engine, but instead redirects the browser's request through affiliate networks, as the equivalent of a click on advertisements. Using the names of popular websites, we have so far identified 170 brand-related keywords that trigger redirections via affiliate programs and result either on the brands' sites or on search assistance pages unrelated to the intended search engine results page.

The subset of customers affected varies from temporally localized deployments to apparently entire customer bases. The DNS-based redirection operates in a surgical fashion, affecting only search engines but not other services such as Google Maps or Yahoo! Mail, and remains completely invisible to the user. The treatment of Google queries varies. Charter and Cogent appear to redirect only Bing and Yahoo, while DirecPC, Frontier and Wide Open West also used to redirect Google to Paxfire proxies located within their own networks. Google has recently put significant pressure (see the answer to the question) on the ISPs to get them to stop redirecting Google searches. As of August 2011, all major ISPs involved have stopped proxying Google, but they still proxy Yahoo and Bing.

Net Neutrality Privacy

| MORE DEEPLINKS POSTS LIKE THIS | RECENT DEEPLINKS POSTS |
|---|---|
| AUGUST 2011<br>An update on Paxfire and search redirection<br>AUGUST 2006<br>How To Keep Your Search History Private<br>AUGUST 2011<br>Website Blocking – Off The Table in the UK (For Now)<br>JUNE 2010<br>European Privacy Officials: Google, Yahoo, and Microsoft Are Still Breaking | JUN 4, 2012<br>EFF Tells CA Supreme Court Warrantless DNA Collection Unconstitutional<br>JUN 1, 2012<br>CA Location Privacy Bill Advances, Similar DC Bill Finally Gets a Hearing<br>JUN 1, 2012<br>Congressional Witnesses Agree: Multistakeholder Processes Are Right for Internet Regulation<br>MAY 31, 2012<br>Trojan Hidden in Fake Revolutionary |

European Privacy Law
MARCH 2008
Software for Keeping ISPs Honest

Documents Targets Syrian Activists
MAY 31, 2012
No Copyrights on APIs: Judge Defends Interoperability and Innovation

## DEEPLINKS TOPICS

- Analog Hole
- Anonymity
- Anti-Counterfeiting Trade Agreement
- Biometrics
- Bloggers Under Fire
- Bloggers' Rights
- Broadcast Flag
- Broadcasting Treaty
- CALEA
- CDA 230
- Cell Tracking
- Coders' Rights Project
- Content Blocking
- Copyright Trolls
- Council of Europe
- Cyber Security Legislation
- CyberSLAPP
- Development Agenda
- Digital Books
- Digital Radio
- Digital Video
- DMCA
- DMCA Rulemaking
- Do Not Track
- DRM
- E-Voting Rights
- EFF Europe

- EFF Software Projects
- FAQs for Lodsys Targets
- File Sharing
- FOIA
- Free Speech
- FTAA
- Health Privacy
- Hollywood v. DVD
- How Patents Hinder Innovation (Graphic)
- Innovation
- Intellectual Property
- International
- International Privacy Standards
- Internet Blacklist Legislation
- Internet Governance Forum
- Locational Privacy
- Mandatory Data Retention
- Mandatory National IDs and Biometric Databases
- Mass Surveillance Technologies
- National Security Letters
- Net Neutrality
- No Downtime for Free Speech
- NSA Spying
- OECD
- Online Behavioral Tracking
- Patent Busting Project
- Patent Trolls

- Patents
- PATRIOT Act
- Pen Trap
- Policy Analysis
- Printers
- Privacy
- Reading Accessibility
- Real ID
- RFID
- Search Engines
- Search Incident to Arrest
- Security
- Social Networks
- Terms Of (Ab)Use
- Test Your ISP
- The Global Network Initiative
- Trans-Pacific Partnership Agreement
- Transparency
- Travel Screening
- Trusted Computing
- Uncategorized
- Video Games
- Wikileaks
- WIPO
- Broadcast Flag

Thanks | RSS Feeds | Copyright Policy | Privacy Policy | Contact EFF





ELECTRONIC FRONTIER FOUNDATION
DEFENDING YOUR RIGHTS IN THE DIGITAL WORLD

SEARCH

HOME | ABOUT | OUR WORK | DEEPLINKS BLOG | PRESS ROOM | TAKE ACTION | SHOP

AUGUST 25, 2011 | BY

## An update on Paxfire and search redirection

By ICSI researchers Christian Kreibich, Nicholas Weaver and Vern Paxson, with Peter Eckersley and Cindy Cohn.

Two weeks ago, EFF published an analysis with researchers at Berkeley ICSI about the redirection of search traffic at a number of US ISPs. The company involved, Paxfire, contacted us to discuss its practices, and based upon those discussions and some further analysis we have a number of clarifications and updates to report. These clarifications are of course our own, and not Paxfire's.

Overall, Paxfire admits that it sends users' searches through its proxy servers (we call this redirection; Paxfire disagrees), and that while the proxies look at the searches for specific things, Paxfire maintains that it does not retain logs of these queries unless the user is searching for specific trademark terms using the search box in the browser. In those cases, the search and IP address are logged and the user is sent to the brand's website directly, rather than to the search engine, and Paxfire and the ISP collect a fee for the referral. Thus, while the Paxfire technology examines and processes users' queries and sometimes sends users a response different than the search engine results page they might have expected (and that is often even branded as a search engine in their browser), Paxfire strongly denies collecting or using any of that information for any purpose other than conducting its affiliate marketing businesses.

Based upon their representations, and assuming for these purposes that they are correct (a pending lawsuit may delve into the matter further), we agree that the blog post wasn't clear enough about the possible differences between the fact that this data is redirected to Paxfire's proxies and what Paxfire says it actually retains, and is limited to retaining by its contracts with ISPs. We do think that the post should have been clearer on that issue. Accordingly, our blog post will be revised as follows:

1. In our post we said that Paxfire "collects" copies of all search terms and results. Taking Paxfire at its word, it would be more precise to say that it "receives, examines and processes all search terms and results, but only logs a small subset of search queries that were entered into a browser search box and are related to major trademarked brands."

2. We said that "this allows Paxfire and/or the ISPs to directly monitor all searches made by the ISPs' customers and build up corresponding profiles, a process on which Paxfire holds a patent." Paxfire first disputes our characterization of "monitoring" and "profiles." We should clarify that while the code on Paxfire's proxy servers examines and processes all affected users' searches, Paxfire maintains that its employees do not. And while it is true that Paxfire's proxies could be reconfigured to do more invasive monitoring of searches, Paxfire says that it does not do this and that its contracts with the ISPs do not allow it to do so. Again, for purposes of this blog post, we take them at their word and have removed these terms, but we will be watching the situation closely as it develops in the lawsuit and elsewhere.

3. Paxfire next disputes the characterization of one of their patents as describing the construction of profiles from searches. Accordingly, we have read that patent more closely. As with many software patents, it is a complicated and ambiguous document. There is no question that the patent overall describes tracking and profiling of Internet users. For instance, it says:

> "In certain embodiments, the Internet appliance may return customer-specific, geographically-relevant, and/or time-relevant content based upon a profile stored for that particular requesting computer or ISP.", and

> "In addition, the result page may be built dynamically in real time and/or on-the-fly based upon profile information stored for the ISP or based upon the IP Address of the requester. The IP Address may be used to localize the requester all the way down to a known individual user and/or provide information about the geo-location of the requesting computer."



Donate to EFF
Join EFF

### Stay in Touch
Email Address
Zip Code (optional)
SIGN UP NOW

### Follow EFF
Is Israel's search of visitors' email accounts legal? Analysis from lawyer @jonklinger
https://eff.org/r.4acA
JUN 6 @ 1:08PM

LinkedIn iOS app caught leaking user meeting details back to their servers, says @nytimes https://eff.org/r.2ac7
JUN 5 @ 6:00PM

Twitter  Facebook  Identi.ca

### Projects
HTTPS Everywhere
Bloggers' Rights
Coders' Rights
FOIA Project
Follow EFF
Free Speech Weak Links
Global Chokepoints
Patent Busting
Surveillance Self-Defense
Takedown Hall of Shame
Teaching Copyright
Ways To Help

However the actual claims in the patent are only about DNS-based profiling. Accordingly, in mentioning the patent, our post should have said that this Paxfire patent has patent **claims** only about DNS-based profiling, and not search-term based profiling. Paxfire also asserts that this particular patent has nothing to do with its current business activities. As a result, we're removing the reference to the patent entirely.

4. Paxfire has told us that it believes it has consent from the affected Internet users to perform the search redirections (and the typo-redirections, which is Paxfire's other service) via ISPs' privacy policies and terms of service. Paxfire also claims that ISPs allow users to opt-out. We have a couple of things to say about this:

   1. We have read a number (although not all) of the privacy policies and terms of service of the ISPs that use Paxfire, and we respectfully disagree that they create anything resembling informed consent for Paxfire's behavior by users. In most instances, subscribers reading these documents would have no idea that Yahoo!, Bing or Google searches in their browser are actually not going to those search engines directly and, in some cases, aren't going to the search engines at all.
   2. If ISPs intend to make significant deviations from the way that Internet users expect the network to function, these changes should be opt-in, especially when the goal (as Paxfire makes crystal clear in its website come-on to ISPs) is not to serve customers as much as to leverage customer activities to create revenue for the ISP and Paxfire. This sort of business model needs to be made especially clear to the customers it affects.

Overall, while we believe these changes to our original blog post are appropriate, we remain deeply concerned by both the privacy and the network neutrality implications of Paxfire's business. We also still strongly recommend HTTPS Everywhere for users who don't want to have to read the fine print of their ISP privacy policy in order to ensure that they are actually talking to the sites they think they are.

Privacy Net Neutrality

## MORE DEEPLINKS POSTS LIKE THIS

AUGUST 2011
Widespread Hijacking of Search Traffic in the United States

OCTOBER 2011
Google Encrypts More Searches

FEBRUARY 2006
Subpoenas and Your Privacy

JANUARY 2010
12 Trends to Watch in 2010

MARCH 2012
Dangerously Vague Cybersecurity Legislation Threatens Civil Liberties

## RECENT DEEPLINKS POSTS

JUN 4, 2012
EFF Tells CA Supreme Court Warrantless DNA Collection Unconstitutional

JUN 1, 2012
CA Location Privacy Bill Advances, Similar DC Bill Finally Gets a Hearing

JUN 1, 2012
Congressional Witnesses Agree: Multistakeholder Processes Are Right for Internet Regulation

MAY 31, 2012
Trojan Hidden in Fake Revolutionary Documents Targets Syrian Activists

MAY 31, 2012
No Copyrights on APIs: Judge Defends Interoperability and Innovation

## DEEPLINKS TOPICS

| | | |
|---|---|---|
| Analog Hole | EFF Software Projects | Patents |
| Anonymity | FAQs for Lodsys Targets | PATRIOT Act |
| Anti-Counterfeiting Trade Agreement | File Sharing | Pen Trap |
| Biometrics | FOIA | Policy Analysis |
| Bloggers Under Fire | Free Speech | Printers |
| Bloggers' Rights | FTAA | Privacy |
| Broadcast Flag | Health Privacy | Reading Accessibility |
| Broadcasting Treaty | Hollywood v. DVD | Real ID |
| CALEA | How Patents Hinder Innovation (Graphic) | RFID |
| CDA 230 | Innovation | Search Engines |
| Cell Tracking | Intellectual Property | Search Incident to Arrest |
| Coders' Rights Project | International | Security |
| Content Blocking | International Privacy Standards | Social Networks |
| Copyright Trolls | | Terms Of (Ab)Use |
| Council of Europe | Internet Blacklist Legislation | Test Your ISP |
| Cyber Security Legislation | Internet Governance Forum | The Global Network Initiative |
| CyberSLAPP | Locational Privacy | Trans-Pacific Partnership Agreement |
| Development Agenda | Mandatory Data Retention | Transparency |
| Digital Books | Mandatory National IDs and Biometric Databases | Travel Screening |
| Digital Radio | | Trusted Computing |

- Digital Video
- DMCA
- DMCA Rulemaking
- Do Not Track
- DRM
- E-Voting Rights
- EFF Europe
- Mass Surveillance Technologies
- National Security Letters
- Net Neutrality
- No Downtime for Free Speech
- NSA Spying
- OECD
- Online Behavioral Tracking
- Patent Busting Project
- Patent Trolls
- Uncategorized
- Video Games
- Wikileaks
- WIPO
- Broadcast Flag