1   DANIEL J. BERGESON, Bar No. 105439
    dbergeson@be-law.com
2   MELINDA M. MORTON, Bar No. 209373
    mmorton@be-law.com
3   JAIDEEP VENKATESAN, Bar No. 211386
    jvenkatesan@be-law.com
4   BERGESON, LLP
    303 Almaden Boulevard, Suite 500
5   San Jose, CA 95110-2712
    Telephone:  (408) 291-6200
6   Facsimile:   (408) 297-6000

7   ANDREW GROSSO, Esq., *pro hac vice*
    Agrosso@acm.org
8   ANDREW GROSSO & ASSOCIATES
    Georgetown Place
9   1101 Thirtieth St., NW, Suite 300
    Washington, D.C. 20007
10  Telephone:  (202) 298-6500
    Facsimile:   (202) 298-5599

11

12  Attorneys for Defendant-Counterclaim Plaintiff
    PAXFIRE, INC.

13

14              UNITED STATES DISTRICT COURT

15      NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

16  BETSY FEIST,                          | Misc. Case No. CV12-80135 SI (NC)

17                                        | Underlying action pending in the United States
                            Plaintiff,    | District Court for the Southern District of
18                                        | New York, Case No. 11 CV 5436 JGK
                                          |        Related cases:
19      vs.                               |          3:12-cv-80119 SI (NC)
                                          |          3:12-cv-80121 SI (NC)
20  RCN CORPORATION and                   |          3:12-cv-80140 SI (NC)
    PAXFIRE, INC.,
21                                        | **STATEMENT OF RECENT DECISION**
                            Defendants.   | **(L.R. 7-3 (d)(2))**
22
                                          | Hon. Judge Susan Illston
23                                        | Courtroom 10, 19th Floor

24

25

26

27

28

Pursuant to Local Rule 7-3( d)(2), Defendant and Counterclaim Plaintiff Paxfire, Inc. ("Paxfire") respectfully submits the following relevant judicial opinion in support of its Opposition to the Motion of Non-Parties the Electronic Frontier Foundation and Peter Eckersley for *De Novo* Determination of Dispositive Matter Referred to Magistrate Judge, which was issued after the filing of Paxfire's Opposition:

      A. *Feist v. RCN Corp., et al*, 1:11-cv-05436 (JGK), United States District Court, Southern District of New York, Order dated September 18, 2012, incorporating by reference the hearing on September 18, 2012. The Order and the transcript of the hearing are attached as Exhibits A and B and include:

      (1) Opinion of United States District Judge John G. Koetl: pages 22-41;

      (2) Ruling on motion of Plaintiff Betsy Feist to dismiss ("motion to dismiss") as to Paxfire's counterclaims for defamation: pages 27-35;

      (3) Ruling on motion to dismiss Paxfire's counterclaims for tortious interference with contract and business relationships: pages 35-40; and

      (4) Ruling on motion to dismiss Paxfire's claim of conspiracy against EFF, ICSI, and Plaintiff: pages 40-41.

Dated:  September 24, 2012           BERGESON, LLP

                                /s/
                           Jaideep Venkatesan

          Attorneys for Attorneys for Defendant-Counterclaim Plaintiff PAXFIRE, INC.

Dated:  September 24, 2012           ANDREW GROSSO & ASSOCIATES

                                /s/
                      Andrew Grosso, *pro hac vice*

          Attorneys for Defendant-Counterclaim Plaintiff PAXFIRE, INC.

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

BETSY FEIST,

                Plaintiff,           11 Civ. 5436 (JGK)

    - against -               **ORDER**

RCN CORP. and PAXFIRE, INC.,

                Defendants.
_____

JOHN G. KOELTL, District Judge:

    For the reasons stated on the record at the argument held

September 18, 2012, the defendant's motion for leave to file

sur-reply is **granted**; the defendant's motion for leave to amend

its third affirmative defense is **granted**; and the plaintiff's

motion to dismiss the counterclaims is **denied in part** and

**granted in part**.

    **The Clerk is directed to close Docket Nos. 47, 55, and 71.**

SO ORDERED.

Dated:    New York, New York
         September 18, 2012

                          John G. Koeltl
                   United States District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 9-19-12

# EXHIBIT B

```
                                                          1
        C9idfeim                      Motion
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2  BETSY FEIST, Individually, and
3  on behalf of all others
3  similarly situated,
4
4                   Plaintiff,
5
5          v.                           11 Civ. 5436 (JGK)
6
6  RCN Corporation and PAXFIRE,
7  INC.,
7
8                   Defendants.
8  ------------------------------x
9                                     New York, N.Y.
9                                     September 18, 2012
10                                    10:36 a.m.
10
11 Before:
11
12                     HON. JOHN G. KOELTL,
12
13                                     District Judge
13
14                       APPEARANCES
14
15 MILBERG, LLP
15      Attorneys for Plaintiff
16 BY:  MELISSA RYAN CLARK
16      PETER E. SEIDMAN
17      ADAM J. BOBKIN
17      SANFORD DUMAIN
18
18 REESE RICHMAN LLP
19      Attorneys for Plaintiff
19 BY:  MICHAEL R. REESE
20
20 BINGHAM McCUTCHEN LLP (NYC)
21      Attorneys for Defendant RCN Corporation
21 BY:  PETER C. NEGER
22
22 ANDREW GROSSO & ASSOCIATES
23      Attorneys for Paxfire, Inc.
23 BY:  ANDREW GROSSO
24
24
25
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

2

```
         C9idfeim                   Motion
 1                THE CLERK:  Feist v. RCN.
 2             All parties please state who they are for the record.
 3                MR. SEIDMAN:  Peter Seidman, with Milberg LLP, for
 4    Betsy Feist.
 5                THE COURT:  I'm sorry.
 6                MR. SEIDMAN:  Peter Seidman, S-e-i-d-m-a-n, with
 7    Milberg LLP, for Ms. Feist.
 8                THE COURT:  Thank you.
 9                MS. CLARK:  Melissa Ryan Clark, with Milberg, also for
10    Ms. Feist.
11                MR. BOBKIN:  Good morning, your Honor.  Adam Bobkin,
12    Milberg, for the plaintiff, Ms. Feist.
13                MR. REESE:  Michael Reese, Reese Richman LLP, on
14    behalf of plaintiff, Ms. Feist.
15                MR. GROSSO:  For Paxfire, Andrew Grosso, of Andrew
16    Grosso & Associates.
17                MR. NEGER:  And for RCN Telecom Services LLC, Peter
18    Neger, with Bingham McCutchen, your Honor.
19                THE COURT:  An interested observer.
20                MR. NEGER:  Indeed.
21                THE COURT:  OK.  I received a letter from Mr. Grosso,
22    dated September 14, 2012, pointing out that there were -- in
23    addition to the motion to dismiss the counterclaims, there were
24    two other motions that were pending.  One was a motion for
25    leave to file a surreply.  I will grant that motion.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

```
        C9idfeim                      Motion
 1              Second, there was a motion for leave to amend the
 2      third affirmative defense and to file a second amended answer.
 3      The only amendment would add Paxfire to the language of the
 4      defense.  And there has been no opposition to that, has there?
 5              MS. CLARK:  No, your Honor.
 6              THE COURT:  OK.  So that motion is granted.
 7              And the amended answer is deemed filed, and the
 8      current motion directed against the counterclaims are directed
 9      against the counterclaims in that most recent pleading.
10              All right.  We now come to the motion to dismiss the
11      counterclaims.
12              Now, I see that this process has resulted in narrowing
13      the counterclaims and several of the counterclaims have been
14      withdrawn, and now I have a motion to dismiss the remaining
15      counterclaims.  I am familiar with the papers.  I am certainly
16      prepared to listen to argument.
17              All right.  Yes?  If anyone wants to argue the motion
18      to dismiss the counterclaims?
19              MS. CLARK:  Good morning, your Honor.  I'm Melissa
20      Clark.  I am here today on behalf of the plaintiff.
21              As you know, we filed a motion to dismiss defendant
22      Paxfire's counterclaims.  Our plaintiff Betsy Feist filed a
23      class action complaint against Paxfire in August of last year,
24      and that complaint alleged, in sum, that Paxfire as well as
25      defendant RCN, who was her Internet service provider, monitored
```

C9idfeim                        Motion

1    and intercepted her Internet use in order to make money off of
2    her searches.  In response to that complaint, Paxfire filed
3    counterclaims seeking in excess of $80 million in damages.
4              THE COURT:  Paxfire alleges that, you know, sort of
5    unusually for this kind of case, that it has been grievously
6    hurt -- grievously -- lost lots and lots of money based in part
7    on what it alleges -- and, you know, these are only allegations
8    in the complaint -- were, among other things, false, defamatory
9    comments spread by the plaintiff even prior to any statements
10   made in the complaint.  But the language appears to be fairly
11   specific.  The charges appear to be fairly specific and quite,
12   you know, damaging -- violation of law spread, allegedly, you
13   know, prior to the time that the lawsuit was even brought.
14             So rather than follow what, you know, some would say
15   is a reasonable way of litigation in the court, it's alleged in
16   the counterclaims that the plaintiff started a campaign prior
17   to the time that the lawsuit was brought and spread false and
18   defamatory comments that actually had a deleterious effect on
19   specific contracts that Paxfire had and on business relations
20   that Paxfire had.  Whether any of that is really true we don't
21   know; this is a motion to dismiss the counterclaims.
22             But the harms are allegedly very grievous, and the
23   statements are very specific.  And I realize that this is a
24   motion to dismiss.  So tell me how, in view of all of that, I
25   can simply, you know, ignore it, say go home, sorry.  You know,

```
                                                                5
        C9idfeim                    Motion
 1   the defendant claims that they've been grievously hurt to the
 2   tune of millions of millions of dollars, and the allegations
 3   are fairly specific.  I know you argue that some of them aren't
 4   so plausible.
 5            On another day you would be arguing to me that I ought
 6   not to dismiss a plaintiff's complaint because the allegations
 7   are, you know, sufficiently detailed and plausible and that the
 8   standards to be applied should not be so rigorously applied as
 9   to deny access to the courts.  It would be, you know,
10   interesting if I applied those standards to these
11   counterclaims.  All I do, though, is I apply the law as best I
12   read it.
13            So your motion.
14            MS. CLARK:  Your Honor, we agree, of course, that the
15   counterclaims must be plausible, and there are a number of
16   pleading standards that Paxfire has simply failed to meet that
17   warrant dismissal on the law.  We've previously moved to
18   dismiss this complaint.  We filed an opposition to Paxfire's
19   leave to amend this complaint -- these counterclaims, rather.
20            THE COURT:  And you were successful because, you know,
21   you read the counterclaims now and you see "withdrawn,"
22   "withdrawn," "withdrawn."
23            MS. CLARK:  Right.  We also moved for sanctions with
24   regard to the initial counterclaims, and yet there are still a
25   number of --
```

```
       C9idfeim                    Motion
 1              THE COURT:  And I think I denied that motion, right?
 2              MS. CLARK:  You did.  You did.  And granted --
 3              THE COURT:  And I did it with a little talk about not
 4     multiplying the proceedings.  Now I have a motion to dismiss
 5     the remaining counterclaims even though they are pretty
 6     specifically pleaded.  Thankfully, I don't have a counter Rule
 7     11 motion that says the other side threatened you that if you
 8     didn't withdraw your motion to dismiss the counterclaims they
 9     would bring a Rule 11 motion against the motion to dismiss the
10     counterclaims.  So I just have to decide the motion to dismiss
11     the counterclaims.
12              MS. CLARK:  Yes, your Honor.
13              There are two sets of statements that Paxfire alleged
14     harmed its business.  The first sort of statement is made in
15     the complaint.  And as we briefed in great detail, statements
16     made in a complaint are privileged.  Unless the complaint is
17     done entirely in bad faith for a solely malicious purpose with
18     no personal interest or intent to prosecute the litigation,
19     statements made in a complaint are protected.
20              The second set of statements that Paxfire has
21     identified are statements that appeared in an article written
22     by the New Scientist.  And I believe there are three specific
23     statements in that article that have been identified in the
24     counterclaims, two of which are a fair and accurate reporting
25     of the complaint and that, too, is protected --
```

7

```
       C9idfeim                    Motion
1               THE COURT:  There had not yet been a complaint.  There
2      was no litigation yet.
3               MS. CLARK:  That is true.  It was written -- I believe
4      the article was published a few hours before the complete got
5      on file.
6               THE COURT:  And the statements must surely have been
7      made obviously before the litigation ever began.  It was an
8      effort to trumpet in the press the allegations.
9               Go ahead.
10              MS. CLARK:  Your Honor, the statements that appear in
11     the New Scientist regarding the litigation are fairly
12     straightforward.  The complaint claims and the complaint
13     alleges violations of the Wiretap Act, for example, and courts
14     have held --
15              THE COURT:  You know, as an allegation of violation of
16     law.
17              MS. CLARK:  Sure.  Sure.  But statements that are
18     pertinent --
19              THE COURT:  So what, right?
20              MS. CLARK:  Statements that are pertinent to a
21     litigation, even if they are made prior to the litigation or in
22     the course of an investigation, are privileged.  And the New
23     Scientist is not a randomly-selected media outlet that Paxfire
24     alleges Ms. Feist called to publish her allegations.
25              The New Scientist had been investigating Paxfire's
```

C9idfeim                          Motion

1    alleged course of conduct for a great deal of time, had
2    reported on the Netalyzr, which is a tool that assisted in
3    discovering Paxfire's alleged conduct.  I wrote about that in
4    May of 2010.  And the two parties had a common interest in
5    investigating the issue.
6              THE COURT:  Well, you know, that argument sort of
7    feeds into the conspiracy arguments by Paxfire, that this was
8    an effort on the part of various people, including the
9    plaintiff, to put Paxfire out of business because they didn't
10   like Paxfire's business.  And you say, well, they have a common
11   interest.  What was their common interest?  Putting Paxfire out
12   of business because they didn't like Paxfire.
13             Even if there were a common interest, the common
14   interest is a qualified privilege, which of course can be
15   overcome by either common law malice or constitutional malice.
16   Very difficult to decide that on a motion to dismiss.
17             Was the plaintiff motivated solely by spite?  Malice?
18   Ill will?  Did the plaintiff know that the charges were in fact
19   not accurate, or was the plaintiff reckless in making the
20   charges?  Difficult to decide on a motion to dismiss.
21             But I'm sorry, I interrupted you.
22             MS. CLARK:  I don't believe that Paxfire alleges that
23   New Scientist was part of the alleged conspiracy.  Paxfire
24   alleges that Ms. Feist, through her counsel, was engaged in a
25   conspiracy with the Electronic Frontier Foundation (EFF) and

C9idfeim                    Motion
1    the International Computer Science Institute (ICSI).  Those two
2    organizations are academic research organizations that Ms.
3    Feist's counsel consulted with in investigating her complaint.
4    And, clearly, investigation of one's claims before they are
5    filed is mandated by Rule 11.  And if every consultation with a
6    technology expert was -- you know, put a plaintiff at risk for
7    conspiracy allegations, I think that would have significant
8    effects on the ability for a plaintiff to have his or her day
9    in court.
10            As far as the malice allegation, they do defeat
11   privileges if they are plausibly pled.  But Ms. Feist, who is
12   present in the courtroom today, is an individual Internet user.
13   She is not a competitor of Paxfire.  She is not a privacy
14   advocate.  She found out that her Internet searches were being
15   viewed and monitored, and has a legitimate interest in not only
16   protecting her privacy but receiving compensation because
17   Paxfire and RCN themselves received compensation from her
18   private information.
19            To defeat a common interest privilege, her intention
20   has to be solely malicious.  If she has any interest, even if
21   it is as a competitor, she can still assert the privilege and
22   be protected for any claims that are alleged to be defamatory.
23            So here I don't think Paxfire has come close to
24   setting forth any plausible theory as to why Ms. Feist would
25   bring such a litigation for a solely malicious intent.

C9idfeim                    Motion

1            With regard to common interest privilege, in addition
2    to having a common interest with the New Scientist, as they
3    were both investigating a privacy concern, Konikoff v.
4    Prudential, which came out of this court in 1999, addressed
5    communications with the media regarding litigation, and stated
6    that, generally, the media is not the entity that the
7    information is being disseminated to, it is the entity the
8    information is being disseminated through.  That wasn't so much
9    the case here.  Ms. Feist's counsel spoke with the New
10   Scientist in the course of investigation of a complaint.  But
11   Ms. Feist also has a common interest with thousands of absent
12   class members.
13           She is a putative representative of a class of
14   thousands of Internet users across multiple Internet service
15   providers, and Konikoff v. Prudential says that where a speaker
16   has an interest in informing a widely dispersed audience of
17   certain facts, it may do so even through the media and is
18   protected from the kinds of allegations that Paxfire is making.
19           In addition, there is a third statement that appears
20   in Paxfire's allegations as a defamatory statement that it
21   alleges Ms. Feist made, but if you actually look at the article
22   its preface was "Researchers believe" and expressly attributes
23   that statement to someone other than Ms. Feist.
24           I think it is also important to note the overarching
25   failure to allege that Ms. Feist herself did anything wrong.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C9idfeim                          Motion

1    She moved into this complaint kind of ambiguously by and
2    through her counsel through communications with EFF and ICSI,
3    but she is not alleged to have personally made any statements,
4    authorized any statements, spoken to EFF, ICSI, or the New
5    Scientist.
6              I think it becomes quite clear that this is a
7    retaliatory action based on the fact that a complaint was filed
8    against Paxfire.
9              I think the same applies with regard to the tortious
10   interference allegations which themselves have a prima facie
11   requirement that you plead malice, wrongful means.  That has
12   not been appropriately pled.
13             And there is also the Noerr-Pennington doctrine which
14   protects the First Amendment right to petition the government
15   to redress your claims, and in this instance Ms. Feist had a
16   legitimate privacy interest.  That petition to the government
17   can be in the form of a publicity campaign or the filing of a
18   complaint, and so she has done so.
19             But even beyond the, you know, perhaps more ambiguous
20   elements of malice and intent, there are simple pleading
21   failures.  For the defamation claims, C.P.L.R. 3016 requires
22   that the particular words be specified in the complaint
23   verbatim.  Paxfire has seen numerous briefings by plaintiff
24   citing this argument and yet has failed to actually quote or
25   specify or even cite paragraphs in the complaint where any of

C9idfeim                    Motion

1   this defamatory language appears.  That is a failure as a
2   matter of law to plead a defamation claim.  Paxfire was unable
3   to plead who the statements were made to, the exact timing of
4   the statements, who exactly made the statements.
5           So there are bigger-picture pleading deficiencies in
6   Paxfire's claims that warrant dismissal.
7           Another issue that Paxfire must establish, that
8   Ms. Feist knew that her statements were false or were
9   negligent, was negligent in failing to investigate her claims.
10  And one of Paxfire's own allegations is that she purportedly
11  conspired with EFF and ICSI.  She consulted with these major
12  research organizations about the accuracy and background of her
13  complaint and --
14          THE COURT:  Do you think that the standard is properly
15  negligence or gross irresponsibility?
16          MS. CLARK:  I think the standard for defamation can be
17  negligence as to her failure to ascertain the truth or falsity
18  of her statement.
19          THE COURT:  OK.  I think the standard may actually be
20  higher.  I mean, I think I would be prepared to say that it's
21  gross irresponsibility under Chapadeau, but I am not sure I
22  have to reach that.
23          MS. CLARK:  I agree.  Under any standard, she went
24  above and beyond to investigate her claims.
25          In addition, reasonable reliance on an investigation

C9idfeim                         Motion

1    defeats any inference that she acted with malice or wrongful
2    means in filing her complaint.
3            There are also other privileges that we've identified
4    in the briefing such as the self-interest privilege, and there
5    is a reasonable belief that the information is of sufficiently
6    important interest to the publisher and that the recipient's
7    knowledge of that information will be of service in the
8    protection of her interests.  So to the extent the Court is not
9    persuaded by these other very strong privileges, certainly
10   Ms. Feist is reasonable in believing that speaking to the New
11   Scientist who is investigating Paxfire's conduct could assist
12   her in protecting her own privacy rights.
13           There is also a privilege that protects statements
14   made that are a legitimate public concern where if privacy --
15   where -- excuse me.  If Feist acted in a grossly irresponsible
16   manner here in failing to rely on a thorough investigation,
17   then perhaps her statements about legitimate public concerns
18   would not be protected.  But privacy rights of thousands of
19   Internet users is in the news every day and is undoubtedly a
20   concern that affects almost the entire population, and such
21   statements are also protected.
22           With regard to damages, Paxfire has also failed to
23   plead some crucial elements.  It pleads very generally that it
24   has business relationships and contracts.  But certainly for
25   tortious interference with contracts, you have to plead the

14

C9idfeim                    Motion

1    terms of those contracts, whether they were terminable at will
2    and whether the alleged tortious interference was the but for
3    cause of the contract's termination, and Paxfire has failed to
4    provide any detail about its contracts or those terms.
5              It also has tortious interference with business
6    relationships claims, but it has yet to allege that Ms. Feist
7    took any action towards those third parties to actually induce
8    them to terminate their relationship with Paxfire.  And that,
9    too, is a required pleading element that none of the issues
10   that I've discussed today create issues of fact.  These are
11   elements that Paxfire must have pled in its counterclaims, and
12   this is its third attempt to do so and it has still failed.
13             I think that covers some of the larger failures in the
14   counterclaims.  If your Honor has any questions?
15             THE COURT:  No.  Thank you.
16             MS. CLARK:  Thank you.
17             MR. GROSSO:  Good morning, your Honor.
18             This case began with EFF in San Francisco.  We've
19   alleged that it was EFF and ICSI that decided, for policy
20   reasons, to destroy Paxfire and its business model.  They then
21   contacted Ms. Feist's lawyers, and Ms. Feist was eventually
22   convinced to bring this case and act as the front.
23             The statements made by the New Scientist three hours
24   before the complaint was filed and the statements made by EFF
25   on its blog after the case was filed are false, as are numerous

15

C9idfeim                    Motion

1   allegations in the complaint itself.
2           The judicial privilege does not apply.  It does not
3   apply to the New Scientist article because the New Scientist
4   was not reporting upon a case that had been filed.  Rather, it
5   was reporting upon leaks that Ms. Feist's attorneys gave to the
6   New Scientist in order to buttress their ad terrorem pact
7   against Paxfire.
8           That New Scientist article has numerous false
9   statements, three of which are clearly specifically correctly
10  specified.  One of them is that Paxfire hijacked searches of
11  millions of Internet users.  Now, we've heard Ms. Clark say
12  that what the language was was that "researchers believe."
13  That is in that article but it's not the only time the term
14  "hijacking" is used.
15          Now, even though the article is not attached to the
16  complaint, it is referenced, and it has been provided to the
17  Court as Exhibit 1B in a filing in January, specifically my
18  opposition to their Rule 11 motion and my response to their
19  opposition to prevent me from filing the amended complaint, so
20  with that, and without trying to turn this into a motion for
21  summary judgment, I am going to read the first sentence of that
22  article.  It says:  "Searches made by millions of Internet
23  users are being hijacked."That is an express defamatory
24  statement and it is false.
25          That Paxfire violated numerous statutes, including

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C9idfeim                    Motion

1   wiretapping laws, is also in that article, and it is defamatory
2   because it says that we're violating criminal law.
3              That Paxfire violated privacy safeguards enshrined in
4   the 1968 Wiretap Act is similarly defamatory to Paxfire.
5              Therefore, we have sufficiently met the standard in
6   terms of specifying defamatory statements in the New Scientist
7   article.  The New Scientist article was not reporting on a
8   lawsuit that had been filed but, rather, was being used by
9   Ms. Feist in order to further terrorize Paxfire.
10             The common interest privilege does not apply.  The
11  case cited by Ms. Clark, Konikoff v. Prudential Insurance
12  Company, says that that privilege does not protect publication
13  to the whole world, which is what the New Scientist did with
14  its magazine and with its website.  So there is no support
15  there for that concept.
16             The article on the website of EFF is similarly not
17  protected.  And I would cite to Williams v. Williams in my
18  brief as well as Long v. -- I can never pronounce this --
19  Marubeni America Corporation, 406 F.Supp.2d 285 (S.D.N.Y),
20  where they specify that there is no protection when a lawsuit
21  is filed purposely in order to enable somebody to publicize
22  defamatory statements afterwards.  That is the situation we
23  have here.  The lawsuit was a vehicle so that EFF and ICSI
24  could take down Paxfire.
25             Similarly, the complaint itself is not protected, and

17

C9idfeim                    Motion

1    that is because the judicial privilege was waived by the
2    leaking to the press before the lawsuit was filed.  And we
3    relied upon Cantu v. Flanigan, cited in our brief.
4              I turn my attention to the Noerr-Pennington Doctrine.
5              The case that Ms. Feist brought is not plausible.  She
6    had a privacy agreement with RCN, that really should be
7    specified as a non-- or anti-privacy agreement, that permitted
8    RCN to do everything that she is now alleging RCN and Paxfire
9    did.  And Paxfire was RCN's contractor and, therefore, its
10   actions fall under the same provisions.  As a result of that,
11   she could not have a plausible belief that her lawsuit would
12   succeed.
13             Further, we take a look at the Netalyzr.  Now, the
14   Netalyzr, which is this software package, initially figured to
15   be prominent before the trier of fact, but I'm not sure that is
16   going to happen anymore.  Out in the West Coast I served
17   subpoenas on the three researchers who designed the Netalyzr
18   and published articles about it and upon ICSI, the
19   International Computer Science Institute, for whom they worked.
20   Ms. Feist filed motions to quash those subpoenas, citing expert
21   consulting privilege, saying they would not call those people
22   as expert witnesses and therefore the privilege prohibited me
23   from interviewing -- from deposing them and obtaining documents
24   from them.
25             The Court, in large part, granted that motion.  I had

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C9idfeim                          Motion

1    not appealed that portion of the motion.  But what it does is
2    if those witnesses are unavailable to me because of the actions
3    of Ms. Feist, they cannot introduce any evidence about the
4    Netalyzr into the fact proceedings of this case.
5              So we're left with a situation where Ms. Feist says
6    that, gee, I looked at the Netalyzr and it showed me that they
7    were doing all of these terrible things, but the Netalyzr
8    cannot do that.  Those are her allegations in the complaint,
9    and we will support that.
10             In other words, using the Netalyzr, Ms. Feist could
11   not possibly have come up with the conclusions that she put
12   into her complaint.  She lied.  Now, whether she lied
13   personally or upon the reliance of her lawyers is not relevant,
14   although, again, the allegation is she personally used the
15   Netalyzr.  But just assuming for the moment that there is some
16   justification that she relied on her lawyers.  Her lawyers are
17   her agents, and the law in this circuit is that attorney
18   knowledge is attributable to a client because there is that
19   attorney relationship.
20             With regard to damages --
21             THE COURT:  On the defamation claim, the standard of
22   responsibility in your view is what?
23             MR. GROSSO:  I think that it would be more than just
24   negligence.  I think --
25             THE COURT:  Gross irresponsibility?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                      19
        C9idfeim                    Motion
1              MR. GROSSO:  Right.  And in view of the fact that she
2      used the Netalyzr and never bothered to verify that with the
3      researchers, the Netalyzr cannot do what she said it did.  I
4      think we meet that.
5              With regard to damages, we have alleged that Paxfire
6      was about to be offered $10 million or more, and as a direct
7      result of this lawsuit and the publicity around it, that offer
8      was withdrawn and the deal was quashed.  As a result, Paxfire
9      is now effectively bankrupt, and we would demonstrate that.  We
10     have been seriously hurt.
11             The tortious interference was directed against
12     Paxfire's clients, its own customers, ISPs, because it was by
13     publicizing this information to the world that the counterclaim
14     defendant knew that Paxfire's customers would believe it.  In
15     fact, there was such a tremendous uproar that among the ten
16     companies mentioned by Ms. Feist in her complaint as being
17     customers of Paxfire, that is ISPs using Paxfire's services,
18     four of them have so far left Paxfire entirely:  RCN
19     Corporation, which is named in count one, for tortious
20     interference.  Since the time that complaint was filed, Wide
21     Open West used, also known as PC Direct, and Insight also
22     terminated their contracts with Paxfire because of this
23     lawsuit.  Others have also left Paxfire but those were not
24     mentioned in --
25             THE COURT:  I thought in your papers you agreed that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

C9idfeim                    Motion

1   you could only maintain the tortious interference with contract
2   based on your prior contract with RCN.
3           MR. GROSSO:  That was at that time because that was
4   the only one of the ten named that had terminated the agreement
5   with Paxfire.  The other -- I will back up.
6           Two tortious interference counts.  Count one is
7   termination of contract.
8           THE COURT:  Right.
9           MR. GROSSO:  At the time the complaint was filed, only
10  one company terminated its contract.  That was RCN.
11          Also a number of other companies mentioned in count
12  two had cut back, curtailed their business with Paxfire.  So
13  that's tortious interference with prospective business
14  advantage.
15          THE COURT:  And tortious interference with business,
16  you relied on XO, RCN, Wide Open West and Direct?
17          MR. GROSSO:  Right.  And I think -- yes.  But since
18  that time Wide Open West used Insight to join RCN in
19  terminating the --
20          THE COURT:  I don't think I can amend your
21  counterclaim at this point.
22          MR. GROSSO:  I understand, but we do have them named
23  in count two so we'll get something for them.
24          But the damage is significant.  We are losing our
25  customers.  We are going out of business, and we lost a $10
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

```
       C9idfeim                    Motion
 1  million client deal.
 2            With regard to Ms. Clark's complaint that I have not
 3  specified in the complaint that the RCN contract was not
 4  terminable at will, the contract is obviously an integral part
 5  of the complaint.  And, again, one can reference contracts if
 6  they are an integral part of the complaint and if they had been
 7  provided -- the contract has been provided to the other
 8  parties.  This has been provided to the plaintiff.  Obviously,
 9  RCN has a copy of it.
10            And I am willing to give one to the Court.  It is not
11  terminable at will, and we can satisfy that requirement.
12            THE COURT:  It is your representation in your papers?
13            MR. GROSSO:  Yes.
14            In summary, the privileges -- there is one more thing.
15            In addition to it being implausible for the reasons
16  I've said, there is a case in this circuit, Paul v. Earthlink,
17  which holds that if an Internet service provider transfers
18  electronic signals to a device in its ordinary course of
19  business, that that is not an interception.  And, indeed, all
20  of the signals that Ms. Feist complains about were transferred
21  to devices of Paxfire in RCN's ordinary course of business.
22            So coupled between the privacy agreement, the law of
23  this circuit and Ms. Feist's misuse of the Netalyzr, there is
24  no way she could have legitimately believed that her case had a
25  basis.  And it was brought for another purpose, it was brought
```

C9idfeim                        Motion
1   for the purpose of knocking out Paxfire.
2            THE COURT:  All right.  Thank you.
3            All right.  I am prepared to decide.
4            The defendant, Paxfire, Inc., brought counterclaims
5   against the plaintiff, Betsy Feist, alleging libel, slander,
6   tortious interference with contracts, tortious interference
7   with business relationships, and civil conspiracy.  The
8   plaintiff has filed a motion to dismiss Paxfire's counterclaims
9   pursuant to Rule 12(b)(6) of the Federal Rules of Civil
10  Procedure.
11           On a motion to dismiss a counterclaim pursuant to
12  Federal Rule of Civil Procedure 12(b)(6), the allegations in
13  the counterclaim are accepted as true.  See Grandon v. Merrill
14  Lynch & Co., Inc., 147 F.3d 184, 188 (2d Cir. 1998).  In
15  deciding a motion to dismiss, all reasonable inferences must be
16  drawn in the counter plaintiff's favor.  See Gant v.
17  Wallingford Board of Education, 69 F.3d 669, 673 (2d Cir.
18  1995); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).  The
19  Court's function on a motion to dismiss is "not to weigh the
20  evidence that might be presented at a trial but merely to
21  determine whether the [counterclaim] itself is legally
22  sufficient."  See Goldman v. Belden, 754 F.2d 1059, 1067 (2d
23  Cir. 1985).
24           The Court should not dismiss counterclaim if the
25  counter-plaintiff has stated "enough facts to state a claim to

```
        C9idfeim                Decision
  1  relief that it is plausible on its face."  See Twombly v. Bell
  2  Atlantic Corp., 550 U.S. 544, 570 (2007).  "A claim has facial
  3  plausibility when the counter-plaintiff pleads factual content
  4  that allows the Court to draw the reasonable inference that the
  5  counter-defendant is liable for the misconduct alleged."  See
  6  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  In deciding the
  7  counter-defendant's motion to dismiss, the Court may consider
  8  documents attached to the counterclaim or incorporated in it by
  9  reference, matters of which judicial notice may be taken, or
 10  documents that the counter-plaintiff relied upon in bringing
 11  suit and either are in her possession or of which she had
 12  knowledge.  See Chambers v. Time Warner, Inc., 282 F.3d 147,
 13  153 (2d Cir. 2002); see also Jofen v. Epoch Biosciences, Inc.,
 14  No. 01 Civ. 4129, 2002 WL 1461351, at *1 (S.D.N.Y. July 8,
 15  2002).  While the Court should construe the factual allegations
 16  in the light most favorable to the counter-plaintiff, "the
 17  tenet that a court must accept as true all of the allegations
 18  contained in a counterclaim is inapplicable to legal
 19  conclusions."  See Iqbal, 556 U.S. at 678; see also Port Dock &
 20  Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir.
 21  2007); Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236,
 22  240 (2d Cir. 2002).
 23          The following factual allegations set forth in the
 24  Amended Counterclaims are accepted as true for the purposes of
 25  this motion to dismiss unless otherwise noted.
```

C9idfeim                    Decision

```
 1              Paxfire is a Delaware corporation with its principal
 2     place of business in Virginia.  Paxfire's primary business
 3     involves the sale of technology services to Internet service
 4     providers ("ISPs").  This business consists of providing error
 5     traffic services and direct navigation services.  Both of these
 6     services direct ISP end-users or customers to Web pages.  Error
 7     traffic services direct end-users to a page suggesting sites
 8     and URL links that the end-user might choose to visit after an
 9     end-user enters an error into the address bar.  Direct
10     navigation services direct ISP end-users to a trademark
11     holder's page after the end-user enters the trademark into the
12     address bar or Web browser.
13              The Electronic Frontier Foundation ("EFF") and the
14     International Computer Science Institute ("ICSI") disproved of
15     Paxfire's business practices of providing error traffic and
16     direct navigation services to ISPs and their end-users.  EFF
17     and ICSI believed these services violated end-users' privacy
18     and should be elective.  Paxfire alleges that this common
19     disapproval formed the basis of an agreement between ICSI and
20     EFF to act as "self-appointed enforcement officials policing
21     the Internet to deter conduct to which they objected."
22              Sometime prior to August 1, 2011, Betsy Feist, the
23     plaintiff, agreed to join EFF and ICI allegedly in
24     accomplishing their goal of discouraging Paxfire's business
25     practices.  Paxfire alleges that Feist acted as the "legal
```

25

C9idfeim                    Decision

1   front," serving "as the necessary third-party plaintiff for the
2   purposes of bringing the class action lawsuit to accomplish the
3   agreement's goals."  (Amended Counterclaim Paragraph 44.)
4           Sometime between August 1, 2011 and August 4, 2011,
5   Feist communicated with Jim Giles of The New Scientist, a media
6   outlet on the Internet.  Paxfire alleges that in addition to
7   informing Giles that she was filing a class action complaint,
8   Feist also made "numerous false and defamatory statements about
9   Paxfire."  (Amended Counterclaim Paragraph 49.)  Specifically,
10  Paxfire alleges that Feist stated (1) "Paxfire 'hijacked'
11  searches of millions of Internet users"; (2) "Paxfire violated
12  numerous statutes, including wiretapping laws'; and (3)
13  "Paxfire violated 'privacy safeguards enshrined' in the 1968
14  Wiretap Act."  (Amended Counterclaim Paragraph 49(d).)  In
15  addition, Paxfire alleges that Feist made these statements "for
16  the purpose of causing an article with these statements to be
17  published."  (Amended Counterclaim Paragraph 49.)
18          On August 4, 2011, Feist filed a class action
19  complaint against Paxfire and RCN Corp. ("RCN").  Paxfire
20  contends that the complaint contains additional defamatory
21  statements.  Paxfire further contends that at the time Feist
22  filed her Class Action Complaint, she "knew that she had
23  insufficient basis to make such statements" and "purposely
24  avoided making inquiry of Paxfire so as not to learn the truth
25  regarding these statements and allegations."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C9idfeim              Decision

1         Paxfire asserts that Feist's defamatory statements
2    damaged Paxfire's business relationships and reputation.  In
3    particular, Paxfire alleges that Feist "intentionally procured,
4    directly and vicariously through her co-conspirators, a breach
5    of Paxfire's contract with RCN."  (Amended Counterclaim
6    Paragraph 61.)  In addition, Paxfire contends that Feist
7    intentionally procured the "reduction, suspension, and
8    termination of Paxfire's business relationships through
9    wrongful means, including misrepresentations and her civil
10   class action lawsuit."  (Amended Counterclaim Paragraph 68.)
11   Paxfire specifically alleges that Feist harmed Paxfire's
12   ongoing business relationships with the following companies:
13   XO Communications, Wide Open West, Direct PC, and RCN.
14   (Amended Counterclaim Paragraph 67.)
15        On August 31, 2011 Paxfire filed initial counterclaims
16   against Feist.  On February 13, 2012 Paxfire filed the present
17   amended counterclaims asserting claims against Feist for (1)
18   slander; (2) libel; (3) tortious interference with contract;
19   (4) tortious interference with business relationships; and (5)
20   civil conspiracy.
21        Feist moves to dismiss the defamation, tortious
22   interference, and civil conspiracy counterclaims pursuant to
23   Federal Rule of Civil Procedure 12(b)(6).  Feist argues that
24   Paxfire's counterclaims should be dismissed because:  (a)
25   Paxfire has not stated a defamation claim with the required

```
        C9idfeim                 Decision
1   particularity; (b) Feist is immune from defamation claims; (c)
2   Paxfire has failed to adequately allege the elements of a
3   tortious interference claim; (d) Feist is protected from
4   tortious interference claims by the Noerr-Pennington doctrine;
5   and (e) Paxfire has not adequately pleaded a civil conspiracy
6   claim.
7           The elements of a defamation claim under New York law
8   are "[1] a false statement, [2] published without privilege or
9   authorization to a third party, [3] constituting fault as
10  judged by, at minimum, a negligence standard, and . . . [4]
11  either caus[ing] special harm or constitut[ing] defamation per
12  se."  Dillon v. City of N.Y., 704 N.Y.S.2d 1, 5 (App. Div.
13  1999).  A claim for libel has an added element, namely that [5]
14  the defamatory statement must be in writing.  See Meloff v. New
15  York Life Insurance Co., 240 F.3d 138, 145, (2d Cir. 2001).
16          For a claim of defamation to meet this standard,
17  courts in this Circuit have held that a plaintiff must
18  identify:  (1) the allegedly defamatory statements; (2) the
19  person who made the statements; (3) the time when the
20  statements were made; and (4) the third parties to whom the
21  statements were published.  Reserve Solutions, Inc. v.
22  Vernaglia, 438 F.Supp.2d 280, 289, (S.D.N.Y. 2006).  See also
23  Mobile Data Shred, Inc. v. United Bank of Switzerland, No. 99
24  Civ. 10315, 2000 WL 351516, at *6 (S.D.N.Y. April 5, 2000).
25  New York Civil Practice Law and Rules Section 3016(a) also
```

28

```
             C9idfeim                 Decision
 1   requires that "[i]n an action for libel or slander, the
 2   particular words complained of shall be set forth in the
 3   complaint, but their application to the plaintiff may be stated
 4   generally."  N.Y. C.P.L.R. Section 3016(a) (McKinney 1991).
 5           As a preliminary matter, the Court must determine the
 6   level of fault applicable in this defamation action.  Under New
 7   York law where the content of a publication is "arguably within
 8   the sphere of legitimate public concern, which is reasonably
 9   related to matters warranting public exposition," the party
10   allegedly defamed by such publication may not recover unless
11   "the publisher acted in a grocery irresponsible manner without
12   due consideration for the standards of information gathering
13   and dissemination ordinarily followed by responsible parties."
14   Chapadeau v. Utica Observer-Dispatch, Inc., 341 N.E.2d 569, 571
15   (N.Y. 1975).  "To act in a 'grocery irresponsible manner' under
16   Chapadeau is to act with more recklessness than the 'ordinary
17   negligence' standard of care."  Med-Sales Associates, Inc. v.
18   Lebhar-Friedman, Inc., 663 F.Supp. 908, 912 (S.D.N.Y. 1987).
19           Although the plaintiff is not a media defendant and
20   did not personally publish any article, the Chapadeau gross
21   irresponsibility standard has been held to apply to a private
22   plaintiff speaking on matters of public concern.  See Konikoff
23   v. Prudential Insurance Co. of America, 234 F.3d 92, 102 (2d
24   Cir. 2000).
25           Here, Feist's statements are arguably within the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

```
         C9idfeim                    Decision
 1   sphere of public concern.   The statements Feist made to Giles
 2   allege that Paxfire was breaking the law by violating the
 3   privacy of millions of Internet users.   Feist then filed a
 4   class action lawsuit seeking to curb this activity.   The public
 5   welfare is benefited from the exposure of illegal activity.
 6   See Pollnow v. Poughkeepsie Newspapers, Inc., 486 N.Y.S.2d 11,
 7   16 (App. Div. 1985).   ('it is [] plain that a private person's
 8   alleged criminal conduct and the operation of the criminal
 9   justice system with respect to the disposition of the charges
10   against such an individual are matters of legitimate public
11   concern.")   Paxfire agrees that gross irresponsibility is the
12   proper standard of fault to be applied.   Accordingly, Feist's
13   statements will be analyzed under the Chapadeau standard.
14            Feist argues that Paxfire has not adequately alleged
15   that she was grossly irresponsible in making the defamatory
16   statements.   But Paxfire has alleged that Feist made "numerous
17   false and defamatory statements about Paxfire" to Jim Giles of
18   The New Scientist.   Moreover, Paxfire has alleged that Feist
19   "did not have evidence as to the truth or falsity of [the]
20   statements," See Amended Counterclaim Paragraph 51, and
21   "purposely avoided . . . learn[ing] the truth regarding these
22   statements and allegations."   See Amended Counterclaim
23   Paragraph 52.   If true, Feist's actions could constitute gross
24   irresponsibility.   See Sepenuk v. Marshall, No. 98 Civ. 1569,
25   2000 WL 1808977 at *3 (S.D.N.Y. Dec. 8, 2000) ('[plaintiff] has
```

C9idfeim                    Decision

1   put forth evidence which could support a finding that the
2   [defendant's] statements . . . were knowingly false, thus
3   evincing gross irresponsibility"); see also Lewis v. Newsday,
4   Inc., 668 N.Y.S.2d 377, 379 (App. Div. 1998) (finding that
5   newspaper's publication of statements from sources who were
6   "mere conduits for unverified rumor" raised a triable issue of
7   fact as to whether the newspaper was "grossly irresponsible"
8   where it made no effort to substantiate statements and sources
9   and made no representation that they had done so).  Feist
10  contends that she cannot be found grossly irresponsible because
11  she reasonably relied on EFF and ICSI when she made her
12  statements.  However, whether Feist's reliance was reasonable
13  is a question of fact best left for the jury.  See Kerman v.
14  City of New York, 374 F.3d 93, 116 (2d Cir. 2004) ("questions
15  as to whether there was gross negligence, intent, or reckless
16  disregard are questions of fact to be answered by the jury.").
17  Accordingly, Paxfire has adequately alleged that Feist was
18  grossly irresponsible when she made the defamatory remarks to
19  Giles with the intent that they be published.
20          Feist next argues that Paxfire has failed to set forth
21  the particular defamatory words complained of or established
22  their falsity.  In order to survive a motion to dismiss "a
23  plaintiff must plead a claim for defamation with adequate
24  specificity to afford defendant sufficient notice of the
25  communications complained of to enable her to defend herself."

```
      C9idfeim                    Decision
 1    See Tasso v. Platinum Guild International, No. 94 Civ. 8288,
 2    1997 WL 16066, at *2 (S.D.N.Y. January 16, 1997.)  Paxfire has
 3    met this standard by alleging three specific defamatory
 4    statements that are allegedly attributable to Feist, and which
 5    are the subject of the defamation claim.  See Amended
 6    counterclaim Paragraph 49.  Paxfire has also alleged that Feist
 7    reported the defamatory statements to Jim Giles at a specific
 8    time, namely, "during the period of August 1 to noon on
 9    August 4, 2011."  See Amended Counterclaim Paragraph 49.  This
10    is sufficient to put Feist on notice of the communications
11    complained of and enable her to defend herself.
12              Although Feist argues that Paxfire has failed to
13    establish the falsity of the defamatory statements, on a motion
14    to dismiss "the Court accepts plaintiff's allegations as true,
15    it assumes that defendants' statements are false and that
16    defendants were culpable in making the statements."  Henneberry
17    v. Sumitomo Corp. of America, No. 04 Civ. 2128, 2005 WL 991772,
18    at *16 (S.D.N.Y. April 27, 2005); see also Lucking v. Maier,
19    No. 03 Civ. 1401, 2003 WL 23018787, at *3 n. 4 (S.D.N.Y.
20    December 23, 2003).  Paxfire has alleged that Feist's
21    statements were false.  Accordingly, Paxfire's allegations of
22    falsity are sufficient to survive a motion to dismiss.  See
23    Daniels v. Provident Life & Casualty Insurance Co., No. 02 Civ.
24    0668E, 2002 WL 31887800, at *5, (W.D.N.Y. December 22, 2002).
25    See also Tuff-N-Rumble Management, Inc. v. Sugarhill Music
```

C9idfeim                    Decision
1  Publishing, Inc., 8 F.Supp.2d 357, 362 (S.D.N.Y. 1998).
2  ("[defendant's] claim that its statements are true raises a
3  factual issue that does not weaken the sufficiency of the
4  pleading").
5           Paxfire also alleges special damages.  See Amended
6  Complaint Paragraph 82.  In addition, Paxfire alleges that
7  Feist made statements that compromised the integrity of
8  Paxfire's business when she accused Paxfire of illegal conduct.
9  Such allegations support a claim of defamation per se.  See
10 Ruder & Finn, Inc. v. Seaboard Surety Co, 422 N.E.2d 518, 522
11 (N.Y. 1981).  See also Treppel v. Biovail Corp., No. 03 Civ.
12 3002, 2004 WL 2339759, at *17 (S.D.N.Y. October 15, 2004).
13          These allegations are sufficient to put Feist on
14 notice of the claims against her.  Accordingly, Feist's motion
15 to dismiss Paxfire's defamation counterclaim on this basis is
16 denied.
17          Feist alternatively argues that her statements were
18 not defamatory because they are protected by the absolute and
19 common interest privileges.
20          "Statements uttered in the course of a judicial or
21 quasi-judicial proceeding are absolutely privileged so long as
22 they are material and pertinent to the questions involved."
23 Bernstein v. Seeman, 593 F.Supp.2d 630, 636 (S.D.N.Y. 2009).
24 "Proceedings are quasi-judicial if:  (1) a hearing is held; (2)
25 both parties may participate; (3) the presiding officer may
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

```
          C9idfeim                Decision
 1   subpoena witnesses; and (4) the body has the power to take
 2   remedial action."  Boice v. Unisys Corp., 50 F.3d 1145, 1150
 3   (2d Cir. 1995).
 4           Here, any statements in Feist's complaint are
 5   protected by the absolute privilege because judicial action is
 6   commenced by filing a complaint with the court.  However, the
 7   absolute privilege does not extend to any statements Feist or
 8   her attorneys made to Jim Giles before the lawsuit was filed
 9   because Giles was not involved in the lawsuit.  See Long v.
10   Marubeni Am. Corp., 406 F.Supp.2d 285, 294 (S.D.N.Y. 2005).
11   ("The privilege is usually understood as not applying . . . to
12   out-of-court statements made to persons not related to the
13   litigation."); see also Schulman v. Anderson Russell Kill &
14   Olick, PC, 458 N.Y.S.2d 448, 453-54 (Sup. Ct. 1982) ("the
15   absolute privilege protecting statements in the course of
16   judicial proceedings does not apply to lawyers' informal
17   communications designed to gather information or to identify
18   potential witnesses").  Furthermore, there is no argument that
19   the statements Feist made to Giles were uttered in the course
20   of a judicial or quasi-judicial proceeding.  Accordingly, the
21   statements Feist made to Giles are not absolutely privileged.
22           Likewise, the common interest privilege does not
23   protect Feist's statements to Giles.  "[D]efamatory
24   communications made by one person to another upon a subject in
25   which both have an interest are protected by the common
```

34

C9idfeim                    Decision

 1   interest privilege, which is a defense to defamation.  Meloff,
 2   240 F.3d at 145 (citing Konikoff, 234 F.3d at 98 (2d Cir.
 3   2000).  A plaintiff may overcome the privilege by proving that
 4   the statement was not substantially true and that the defendant
 5   abused the privilege.  See id. at 146.  A defendant abuses the
 6   privilege if the defendant acted beyond the scope of the
 7   privilege, acted with common law malice, or acted "with
 8   knowledge that the statement was false or with a reckless
 9   disregard as to its truth."  Id.  (Citing Weldy v. Piedmont
10   Airlines, Inc., 985 F.2d 57, 62 (2d Cir. 1993)).
11          Here, Feist alleges that her communications with Giles
12   are protected by the qualified privilege because she has a
13   common interest with Jim Giles.  However, Paxfire contends that
14   Feist abused her common interest privilege because she acted
15   with malice.  See Amended Complaint Paragraph 81.  Thus,
16   whether the common interest privilege protects Feist's
17   communications is a question of fact that cannot be decided at
18   this stage of the litigation.  See Boyd v. Nationwide Mut. Ins.
19   Co., 208 F.3d 406, 410 (2d Cir. 2000) ("[Plaintiff]'s claim
20   raises doubts about the defendant's good faith, which is the
21   linchpin of any qualified privilege . . . [that] permits a
22   sufficient inference that Nationwide abused its qualified
23   privilege."); see also Stern v. Leucadia Nat.'l Corp., 844 F.2d
24   997, 1004 (2d Cir. 1988).  Thus, it cannot be determined on a
25   motion to dismiss that Feist's statements to Giles are

35

C9idfeim                    Decision

1   privileged and Paxfire has adequately pleaded its defamation
2   claim.  Accordingly, Feist's motion to dismiss Paxfire's
3   defamation counterclaim is denied with respect to any
4   statements Feist made to Giles before she filed her lawsuit.
5              Feist next argues that Paxfire has failed to
6   adequately plead a claim for tortious interference.
7              In particular, Feist contends that Paxfire has not
8   adequately allege the existence of valid contracts with the
9   ISPs.  Under New York law, the elements of a tortious
10  interference with contract claim are (1) the existence of a
11  valid contract between the plaintiff and a third party; (2) the
12  defendant's knowledge of the contract; (3) the defendant's
13  intentional procurement of the third party's breach of the
14  contract without justification; (4) actual breach of the
15  contract; and (5) damages resulting therefrom.  Kirch v.
16  Liberty Media Corp., 449 F.3d 388, 401-02 (2d Cir. 2006).
17  Paxfire has alleged that it had valid contracts with eleven
18  ISPs.  See Amended Complaint Paragraph 59.  Paxfire has also
19  alleged that Feist had actual knowledge of these contracts.
20  See Amended Counterclaim Paragraph 60.  This allegation is
21  supported by the fact that Feist identified that Paxfire had
22  business relationships with all the relevant ISPs, except XO
23  Communications, in her own complaint.  Further, Paxfire alleges
24  that it suffered damages as a result of Feist's actions.  See
25  Amended Counterclaim Paragraph 63 and 82.  Although Feist

36

C9idfeim                    Decision

 1   argues that Paxfire has failed to plead that its contracts were
 2   not terminable at will, this does not warrant dismissal unless
 3   it is clear that such contracts were in fact terminable at
 4   will.  See AIM Int'l Trading, L.L.C. v. Valcucine S.p.A., No.
 5   02 Civ. 1363, 2003 WL 21203503, at *5 (S.D.N.Y. 2003).  Thus,
 6   because it is not clear from the Amended Counterclaim that
 7   Paxfire's contracts are terminable at will, this does not
 8   provide a basis for dismissal.  Indeed, Paxfire has proffered
 9   that its contracts with the ISPs were not terminable at will.
10   See Plaintiff's Memo of Law at 13.
11           However, of the eleven ISPs cited, Paxfire has only
12   alleged actual contract breaches with RCN and XO
13   Communications.  See Amended Counterclaims Paragraphs 61 and
14   82.  Further, Paxfire only alleges that Feist intentionally
15   procured an unjustified breach of Paxfire's contract with RCN.
16   See Amended Counterclaim Paragraph 61.  Indeed, Paxfire
17   concedes this point.  Accordingly, Paxfire may only maintain a
18   claim for tortious interference with contract based on its
19   previous contract with RCN.  See RSM Production Corp. v.
20   Fridman, 643 F.Supp.2d 382, 405 (S.D.N.Y. 2009).
21           Although Paxfire may not maintain a claim for tortious
22   interference with contract with the other ISPs, it may sustain
23   its claim for tortious interference with business relationships
24   with the ISPs.  To state a claim for tortious interference with
25   a business relationship a plaintiff must allege that "(1) the

```
         C9idfeim              Decision
 1   plaintiff had a business relation with a third party; (2) the
 2   defendant interfered with those business relations; (3) the
 3   defendant acted for a wrongful purpose or used dishonest,
 4   unfair, or improper means; and (4) the defendant's acts injured
 5   the relationship."  Catskill Development, L.L.C. v. Park Place
 6   Entertainment Corp., 547 F.3d 115, 132 (2d Cir. 2008).
 7              Feist argues that Paxfire has inadequately pleaded
 8   that it had business relationships, but Paxfire has alleged
 9   prior business relationships with ten ISPs.  See Amended
10   Complaint Paragraph 65.  Paxfire also alleges that Feist
11   interfered with its ongoing business relationships with these
12   ISPs.  See Amended Counterclaim Paragraph 67.  Further, Paxfire
13   alleges that Feist used wrongful means to interfere with these
14   business relationships.  See Amended Counterclaim Paragraph 68.
15   Feist argues that this is insufficient because Paxfire has
16   failed to allege that Feist acted solely by wrongful means.
17   However, the wrongfulness of Feist's actions cannot be
18   determined at the motion to dismiss stage of the litigation.
19   See, for example, Cerveceria Modelo S.A. De C.V. v. USPA
20   Accessories LLC, No. 07 Civ 7998, 2008 WL 1710910, at *5
21   (S.D.N.Y. April 10, 2008); see also Mina Inv. Holdings Ltd. v.
22   Lefkowitz, 184 F.R.D. 245, 251 (S.D.N.Y. 1999).
23              However, at this point Paxfire has only alleged actual
24   injuries to its business relationships with XO Communications,
25   RCN Corporation, Wide Open West and Direct PC.  See Amended
```

38

C9idfeim                   Decision
1    Counterclaim Paragraph 67.  Paxfire also alleges that Feist was
2    aware of its business relationship with each of these entities.
3    See Amended Counterclaim Paragraph 66.  Therefore, Paxfire's
4    Counterclaim alleging tortious interference with its business
5    relations with each of these four ISPs cannot be dismissed on
6    this motion to dismiss.
7              Feist argues that even if Paxfire has adequately
8    pleaded a tortious interference claim, she is protected by the
9    Noerr-Pennington Doctrine.  This Doctrine, which derives from a
10   trilogy of antitrust cases decided by the Supreme Court and is
11   based on First Amendment principles guaranteeing the right to
12   petition the government, immunizes from antitrust scrutiny
13   "mere attempts to influence the passage or enforcement of
14   laws,"  Eastern Railroad Presidents Conference v. Noerr Motor
15   Freight, Inc., 365 U.S. 127, 135 (1961), regardless of any
16   anticompetitive motives behind these attempts, as well as
17   good-faith attempts to secure legitimate goals through
18   administrative agencies and courts.  See California Motor
19   Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510-11
20   (1972).  The doctrine has also been extended to areas outside
21   of the antitrust arena, and has specifically been held to
22   protect the exercise a defendant's First Amendment rights even
23   when such action would normally constitute tortious
24   interference.  See NAACP v. Claiborne Hardware Co., 458 U.S.
25   886, 911-12 (1982).  The doctrine, however, does not shield a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

```
        C9idfeim                   Decision
1    defendant from liability for instituting "sham" litigation.
2    See Noerr, 365 U.S. at 144; see also Professional Real Estate
3    Investors v. Columbia Pictures Industries, Inc., 508 U.S. 49,
4    60-61 (1993).
5              Here, Paxfire alleges that Feist committed tortious
6    interference before filing her lawsuit by making false
7    statements to private third parties.  These actions would not
8    be protected by the Noerr-Pennington Doctrine because they were
9    not directed at any federal agency.  Moreover, these acts were
10   not in any way incident to her litigation.  Thus, the Doctrine
11   would not shield Feist from liability for any alleged tortious
12   interference that occurred prior to filing her lawsuit.
13             Paxfire also argues that Feist's litigation is a sham
14   and therefore that the Noerr-Pennington Doctrine is not
15   applicable to her lawsuit.  However, whether Feist's lawsuit is
16   a sham is a factual issue that cannot be decided at the
17   motion-to-dismiss stage of litigation.  See Riddell Sports,
18   Inc. v. Brooks, No. 92 Civ. 7851, 1997 WL 148818, at *5
19   (S.D.N.Y. March 27, 1997.  ("Whether litigation is a sham is a
20   fact-intensive inquiry that cannot be decided on a motion for
21   summary judgment."); see also N.Y. Jets LLC v. Cablevision
22   Systems Corp., No. 05 Civ. 2875, 2005 WL 3454652 at *2
23   (S.D.N.Y. December 19, 2005) ("where . . . facts are in
24   dispute, there is no requirement that a court determine whether
25   the sham exception applies without the benefit of full
```

```
           C9idfeim                 Decision
  1    discovery.")  (Internal quotation marks omitted.)
  2              Finally, Feist moves to dismiss Paxfire's civil
  3    conspiracy claim.  The elements of a civil conspiracy claim are
  4    "(i) an agreement between two or more persons, (ii) an overt
  5    act, (iii) an intentional participation in the furtherance of a
  6    plan or purpose, and (iv) resulting damages."  Official
  7    Committee of Unsecured Creditors v. Donaldson, Lufkin &
  8    Jenrette Securities Corp., No. 00 Civ. 8688, 2002 WL 362794 at
  9    *13 (S.D.N.Y. March 6, 2002.)  In addition, New York does not
 10    recognize a substantive tort of civil conspiracy.  See, e.g.,
 11    Antonios A. Alevizopoulos & Associates v. Comcast International
 12    Holdings, Inc., 100 F.Supp.2d 178, 187 (S.D.N.Y. 2000).  In
 13    order to state a claim for civil conspiracy, therefore, there
 14    must be an allegation of an independent intentional tort.  See
 15    Agron v. Douglas W. Dunham, Esq. & Assocs., No. 02 Civ. 10071,
 16    2004 WL 691682, at *6 (S.D.N.Y. March 31, 2004); see also
 17    Alevizopoulos & Associates, 100 F.Supp.2d at 187-88.
 18              In the present case, Paxfire alleges that Feist
 19    entered into an agreement with EFF and ICSI to disrupt
 20    Paxfire's business.  See Amended Counterclaim Paragraph 44.
 21    Paxfire alleges that this agreement was furthered, in part, by
 22    an e-mail circulated between the alleged conspirators.  In
 23    addition, Paxfire asserts that Feist intentionally participated
 24    in this plan by making statements to Jim Giles, and that these
 25    statements damaged Paxfire.  Paxfire has also alleged that
```

C9idfeim                    Decision
1   there are underlying intentional torts which were the object of
2   the civil conspiracy.  Thus, Paxfire has alleged enough facts
3   to adequately plead a civil conspiracy claim.  Accordingly,
4   because the civil conspiracy claim hinges on the aforementioned
5   tort claims, the same issues which preclude dismissal of those
6   claims prevent dismissal of the civil conspiracy claim.  See
7   Omni Consulting Group, Inc. v. Marina Consulting, Inc., No. 01
8   Civ. 511A, 20007 WL 2693813, at *8 (W.D.N.Y. September 12,
9   2007).
10          The Court has carefully considered all of the
11  arguments of the parties.  To the extent not specifically
12  addressed above, remaining arguments are either moot or without
13  merit.  For the foregoing reasons, the plaintiff's motion to
14  dismiss the Amended Counterclaims is denied in part and granted
15  in part.
16          The Clerk is directed to close Docket No. 747.
17          So ordered.
18          All right.  There is a scheduling order and the case
19  is proceeding apace.
20          MR. NEGER:  This is Peter Neger, your Honor.
21          We had a status conference with Magistrate Judge Ellis
22  I guess it would be a week ago, and he directed the parties to
23  make some adjustments to the scheduling order.  We submitted a
24  proposed revised order to him I think it was yesterday.  I
25  could hand that up to your Honor if you wish, but I know it is

C9idfeim                    Decision

1   before Magistrate Judge Ellis for his review, and I suspect
2   that he will approve it and pass it on to your Honor.
3           THE COURT:  OK.  Actually, I assigned it to Magistrate
4   Judge Ellis for general pretrial, right?
5           MR. NEGER:  Yes.
6           THE COURT:  So I assume that he can sign the revised
7   scheduling order.
8           MR. NEGER:  Perfect.
9           THE COURT:  What is the date for the completion of
10  discovery?
11          MR. NEGER:  The fact discovery is completed, your
12  Honor --
13          THE COURT:  Could you pass it up.
14          MR. NEGER:  Yes.  Absolutely.
15          THE COURT:  It would be helpful.  Thank you.
16          (Pause)
17          OK.  Thank you.
18          Is this copy for me?
19          MR. NEGER:  You may have it, your Honor.
20          THE COURT:  All right.  Anything else?
21          (Pause)
22          OK.  Good morning, all.
23          MR. NEGER:  Thank you, your Honor.
24                          -  -  -
25